# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

|  |  |
|---|---|
| IN RE: RBC DAIN RAUSCHER OVERTIME LITIGATION | Civil No. 06-3093 (JRT/FLN)<br><br>**MEMORANDUM OPINION AND ORDER** |

Peter A. Muhic and Michelle A. Coccagna, **BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**, 280 King of Prussia Road, Radnor, PA 19087; Vernon J. Vander Weide, **HEAD SEIFERT & VANDER WEIDE**, 333 South Seventh Street, Suite 1140, Minneapolis, MN 55402-2422; and John Halebian, **LOVELL STEWART HALEBIAN LLP**, 61 Broadway, Suite 501, New York, NY 10006, for plaintiffs.

Sari M. Alamuddin and Alison B. Willard, **MORGAN LEWIS & BOCKIUS LLP**, 77 West Wacker Drive, Suite 500, Chicago, IL 60601; Rebecca D. Eisen, **MORGAN LEWIS & BOCKIUS LLP,** One Market, Spear Street Tower, San Francisco, CA 94105; and Nicole Haaning, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN, 55402-1498, for defendants.

Plaintiffs Carlos Alvarez, Ana Blumberg-Markus, Susan Capozzoli, Andres Cruz, Eugene David, Patrick Grattan, Christopher Kennedy, Martin Kuhlman, Felipe Pazos, and Alberto Roque (collectively, "plaintiffs"), on behalf of themselves and all others similarly situated, brought this putative nationwide collective action and class action against their employer RBC Capital Markets Corporation and its related and predecessor entities, including RBC Dain Rauscher, Inc., RBC Capital Markets, RBC Global Debt Markets US (collectively, "RBC"), alleging overtime and minimum wage violations under the Fair Labor Standards Act ("FLSA") and violations of certain provisions of the Employee Retirement Income Security Act of 1974 as amended ("ERISA") and certain

state labor laws. RBC contends that the plaintiffs fall within one or more of the FLSA exemptions for minimum wages and overtime pay, and that there is no factual basis for the ERISA or state law claims. RBC filed motions for summary judgment as to each plaintiff, and plaintiffs filed motions for conditional certification of a collective action and for class certification. For the reasons stated below, the Court grants the motions for summary judgment as to Grattan, Pazos, and Roque, grants in part and denies in part the motions for summary judgment as to Alvarez, Capozzoli, Blumberg-Markus, Cruz, David, Kennedy, and Kuhlman, grants plaintiffs' motion for conditional certification of a collective action, and denies plaintiffs' motion for class certification.

## BACKGROUND

RBC is a registered broker dealer in the United States and holds itself out as providing investment banking and investment services to high-net-worth individuals. (Def.'s Answer to Pls.' Second Consolidated Am. Compl. ¶ 57, Docket No. 85.) RBC's business is divided into three major segments: the Private Client Group, which serves individual investors; the Fixed Income Capital Markets Team, which serves institutions, municipalities, and nonprofit organizations; and the Clearing and Execution Services Group, which serves independent brokers. (Second Consolidated Am. Compl. ¶ 55, Docket No. 77; Iverson Supp. Decl. ¶ 4, Docket No. 242.) RBC maintains at least 43 offices in the United States, and it is an indirectly wholly owned subsidiary of the Royal Bank of Canada. (Def.'s Answer to Pls.' Second Consolidated Am. Compl. ¶¶ 57-58,

Docket No. 85.)  RBC is incorporated in Minnesota and its principal place of business is New York.

The plaintiffs are former RBC employees who worked for RBC in California, Florida, and New York as securities brokers, also known as "registered representatives." Blumberg-Markus, David, Kennedy, and Kuhlman (the "California plaintiffs") worked in the Private Client Group in RBC's California offices.  All of the California plaintiffs held the title of Financial Consultant, and Kennedy also held the title of Senior Investment Associate.  Capozzoli worked as a Senior Investment Associate and as a Senior Financial Associate in the Private Client Group in RBC's New York offices.  Alvarez, Cruz, Grattan, Pazos, and Roque (the "Florida plaintiffs") worked in the Fixed Income Group in RBC's Miami office.  Grattan, Pazos, and Roque held the title of Institutional Salesperson, Cruz held the title of Junior Salesperson, and Alvarez held the title of Salesperson.  In a 2007 downsizing, RBC terminated approximately 48 securities brokers, including the Florida plaintiffs.  (*Id.* ¶ 77.)

Plaintiffs allege that they worked at RBC as inside sales people whose duties were set forth in uniform, company-wide policies and procedures.  (Second Consolidated Am. Compl. ¶¶ 14, 17, Docket No. 77.)  As such, they would likely be eligible for overtime compensation and minimum wage under the FLSA and state law.  RBC's motions for summary judgment require the Court to conduct an individualized analysis of the work

duties of each of the ten plaintiffs,[1] but three job characteristics are common to all or

nearly all of the individual plaintiffs: their compensation arrangement, the "Series 7"

license requirement for registered representatives, and the "Know Your Customer" rules

established by the Financial Industry Regulatory Authority ("FINRA"), the successor to

the National Association of Securities Dealers ("NASD").

RBC compensates its securities brokers "principally on a commission basis,

irrespective of the hours actually worked." (*Id.* ¶ 17.) RBC guarantees that a securities

broker's compensation will always meet the minimum salary requirement under the

FLSA. (Iverson Dep. at 120, Wells Decl. Ex. 23, Docket No. 231.) If a broker's

commission-based compensation falls beneath the FLSA minimum, RBC automatically

increases compensation for that pay period so that it will meet the minimum. (*Id.* at 120-

21.) RBC views these automatic payments "as a non-forgivable draw against future

[commission] payments." (*Id.* at 121.) The payments are therefore "offset . . . in future

---

[1] Much of the relevant evidence appears in transcripts of the depositions of the named plaintiffs and in the exhibits attached thereto. (Alvarez Dep., Willard Aff. Ex. A, Docket No. 142; Alvarez Dep., Wells Decl. Ex. 2, Docket No. 231; Blumberg-Markus Dep., Alamuddin Decl. Ex. A, Docket No. 153; Blumberg-Markus Dep., Wells Decl. Ex. 4, Docket No. 231; Capozzoli Dep., Willard Aff. Ex. A, Docket No. 132; Capozzoli Dep., Wells Decl. Ex. 6, Docket No. 231; Cruz Dep., Willard Aff. Ex. A, Docket No. 137; Cruz Dep., Wells Decl. Ex. 8, Docket No. 231; David Dep., Alamuddin Decl. Ex. A, Docket No. 158; David Dep., Wells Decl. Ex. 10, Docket No. 231; Grattan Dep., Willard Aff. Ex. A, Docket No. 117; Grattan Dep., Wells Decl. Ex. 12, Docket No. 231; Kennedy Dep., Alamuddin Decl. Ex. A, Docket No. 286; Kennedy Dep., Wells Decl. Ex. 14, Docket No. 231; Kuhlman Dep., Alamuddin Decl. Ex. A, Docket No. 163; Kuhlman Dep., Wells Decl. Ex. 16, Docket No. 231; Pazos Dep., Willard Aff. Ex. Ex. A, Docket No. 127; Pazos Dep., Wells Decl. Ex. 18, Docket No. 231; Roque Dep., Willard Aff. Ex. A, Docket No. 122; Roque Dep., Wells Decl. Ex. 20, Docket No. 231.) The Court hereinafter cites these deposition transcripts and exhibits without reference to the affidavits and declarations to which they are attached and without reference to the docket numbers for those affidavits and declarations.

months." (*Id.*) RBC uses "a recovery process to track the [makeup] payments and recoup (or recover) the amount from future commission months in which the [broker] is above the minimum." (Wells Decl. Ex. 51, Docket No. 231.)

A second component of RBC's compensation arrangement relates to broker errors in placing trade orders. If a broker makes an error in executing a trade, RBC cancels the broker's anticipated commission for that trade and, if RBC incurs any loss based on the error, RBC deducts that loss from the broker's future commissions.

FINRA regulations require any securities broker who deals directly with customers and who sells and discusses securities with those customers to obtain a Series 7 license. (Alvarez Dep. at 77.) The Series 7 licensing examination is the qualification examination for general securities registered representatives. (Grattan Dep. Ex. 3 at 1.) The Series 7 examination is a six-hour, 250-question multiple-choice examination that "seeks to measure accurately and reliably the degree to which each candidate possesses the knowledge, skills and abilities needed to perform the critical functions of a registered representative." (*Id.*) It "intends to measure competence at an **entry** level." (*Id.*) The New York Stock Exchange publishes a thirty-six page booklet with a content outline of the topics the Series 7 examination covers and some sample questions. (Grattan Dep. Ex. 3.) The outline is based on seven "critical functions and tasks" of the registered representative. (*Id.* at 2-4.) In performing the critical functions, a registered representative:

(1)    Seeks business for the broker-dealer through customers and potential customers. . . .

(2)    Evaluates customers in terms of financial needs, current holdings, and available investment capital, and helps them identify their investment objectives. . . .

(3)    Provides customers and prospective customers with information on investments and makes suitable recommendations. . . .

(4)    Opens, transfers, and closes customer accounts and maintains appropriate account records. . . .

(5)    Explains the organization, participants, and functions of various securities markets and the principal factors that affect them. . . .

(6)    Obtains and verifies the customer's purchase and sale instructions, enters orders, and follows up on completion of transactions. . . . [and]

(7)    Monitors the customer's portfolio and makes recommendations consistent with changes in economic and financial conditions as well as the customer's needs and objectives.

(*Id.* at 3.)  The substance of the outline corresponds to a variety of laws, rules, and regulations governing the work of registered representatives.  (*See id.* at 23-26.)

According to Grattan, the Know Your Customer rules require a registered representative to "ensure that the services and advice provided to [the] client are suitable for [the client's] investment needs, and that the client is a bona fide client and the information they provide is correct."  (Grattan Dep. at 23; *see, e.g.*, Alvarez Dep. Ex. 1.) Capozzoli explained that the rules require a registered representative to understand "as much about the customer's financial situation and even partially personal situation to make proper recommendations as a registered representative."  (Capozzoli Dep. at 26.) Cruz explained that the purpose of the rules is "to know the source of the funds that your client invests," and "to know what securities they can invest in or what securities are better suited for that type of client."  (Cruz Dep. at 27.)

Plaintiffs allege that they "regularly worked in excess of forty (40) hours per workweek and/or in excess of eight (8) hours per day." (Second Consolidated Am. Compl. ¶ 14, Docket No. 77.) They allege that they are entitled to unpaid wages from RBC for hours worked in which they did not receive minimum wages mandated under the FLSA and state law, and that they are entitled to unpaid wages for overtime work for which they did not receive overtime premium pay mandated under the FLSA and state law. (*Id.* ¶¶ 8-11.) The California plaintiffs also allege that RBC violated ERISA and California law by taking improper payroll deductions for a non-ERISA plan and by improperly retaining contributions to a deferred compensation plan that did not meet the qualifications necessary to avoid ERISA coverage. (*Id.* ¶ 13.)

On July 24, 2006, two plaintiffs who are no longer parties to this action filed a complaint against RBC in the United States District Court for the District of Minnesota. (Compl., Docket No. 1.)

On July 27, 2006, David filed a class action complaint in California state court, and RBC removed the case to the United States District Court for the Central District of California. *David v. RBC Dain Rauscher*, No. 06-4402, Docket No. 46 (D. Minn. Nov. 3, 2006). On October 30, 2006, the Central District of California granted RBC's motion to transfer venue to the District of Minnesota. *Id.*

On October 19, 2006, Kennedy and an individual who is no longer a party to this action filed a class action complaint in California state court, and RBC removed the case to the Central District of California. *Kennedy v. RBC Dain Rauscher*, No. 07-500,

Docket No. 16 (D. Minn. Jan. 26, 2007). On January 22, 2007, the Central District of California granted RBC's motion to transfer venue to the District of Minnesota. *Id.*

On March 9, 2007, Kuhlman and Susan Sabin[2] filed an amended complaint, substituting themselves for the two original plaintiffs. (Amended Class/Collective Action Compl. at 1 n.1, Docket No. 27.)

On May 11, 2007, Magistrate Judge Franklin L. Noel issued an order granting Kuhlman and Sabin's motion to consolidate cases. (Docket No. 42.) On May 24, 2007, pursuant to that order, David, Kennedy, Kuhlman, Sabin, as well as Blumberg-Markus, filed a consolidated amended complaint. (Consolidated Am. Compl., Docket No. 43.)

On December 11, 2007, Capozzoli filed a class action complaint in the United States District Court for the Southern District of New York. *Capozzoli v. RBC Dain Rauscher, Inc.*, No. 08-935, Docket No. 8 (D. Minn. Apr. 3, 2008). On March 24, 2008, pursuant to the parties' stipulation, the court transferred the case to the District of Minnesota. *Id.*

On March 6, 2008, Alvarez, Cruz, Grattan, Pazos, and Roque filed a class action complaint in the United States District Court for the Southern District of Florida. *Pazos v. RBC Dain Rauscher, Inc.*, No. 08-1029, Docket No. 10 (D. Minn. Apr. 10, 2008). On April 7, 2008, pursuant to the parties' stipulation, the court transferred the case to the District of Minnesota. *Id.*

---

[2] The Court is unable to find anything in the record to indicate whether Sabin is still a party to this action. The second consolidated amended complaint names her as a plaintiff. (Docket No. 77.)

On August 6, 2008, plaintiffs filed a second consolidated amended complaint. (Second Consolidated Am. Compl., Docket No. 77.) The complaint alleges a nationwide collective action on behalf of all RBC securities brokers, a California state-wide class action on behalf of all RBC securities brokers within the State of California, a New York state-wide class action on behalf of all RBC securities brokers within the State of New York, a Florida state-wide class action on behalf of all RBC securities brokers within the State of Florida, and an ERISA class on behalf of all RBC securities brokers whom RBC "induced and/or required to contribute to a deferred compensation plan" that RBC claimed was a non-ERISA plan. (*Id.* ¶¶ 2-6.)

The complaint alleges fifteen causes of action. The first and second counts are brought on behalf of the nationwide collective class. Count 1 alleges failure to pay overtime in violation of the FLSA. (*Id.* ¶¶ 81-88.) Count 2 alleges failure to pay minimum wage in violation of the FLSA. (*Id.* ¶¶ 89-92.)

Counts 3 through 11 are brought on behalf of the California plaintiffs and a California class. Count 3 alleges failure to pay overtime, in violation of California law. (*Id.* ¶¶ 93-103.) Count 4 alleges failure to pay California's minimum wage, in violation of California law. (*Id.* ¶¶ 104-07.) Count 5 alleges that RBC made illegal deductions from the California plaintiffs' wages. (*Id.* ¶¶ 108-15.) Count 6 alleges failure to reimburse employees for necessary expenditures incurred in direct consequence of work duties, in violation of California law. (*Id.* ¶¶ 116-19.) Count 7 alleges failure to comply with deadlines for payment of wages, in violation of California law. (*Id.* ¶¶ 120-23.) Count 8 alleges failure to pay employees within the proper pay period by paying

employees only once per month, in violation of California law. (*Id.* ¶¶ 124-26.) Count 9 alleges failure to provide rest and meal breaks, in violation of California law. (*Id.* ¶¶ 127-29.) Count 10 alleges failure to provide accurate and detailed records of hours worked and wages earned, in violation of California law. (*Id.* ¶¶ 130-32.) Count 11 alleges violations of California's unfair competition law resulting from RBC's violations of the California Labor Code. (*Id.* ¶¶ 133-40.)

Counts 12 and 13 are brought on behalf of Capozzoli and a New York class. Count 12 alleges failure to pay overtime, in violation of New York law. (*Id.* ¶¶ 141-47.) Count 13 alleges that RBC made illegal deductions from employees' wages, in violation of New York law. (*Id.* ¶¶ 148-57.)

Count 14 is brought on behalf of the Florida plaintiffs and a Florida class. It alleges failure to pay minimum wage, in violation of Florida law. (*Id.* ¶¶ 158-62.)

Count 15 is brought on behalf of the ERISA class. It alleges that RBC caused class members to forfeit all income within an ERISA deferred compensation plan upon termination of employment, in violation of ERISA and California law. (*Id.* ¶¶ 163-70.)

On May 13, 2009, the Court denied RBC's motion for judgment on the pleadings on the fifteenth cause of action, concluding that, for purposes of the motion, plaintiffs' allegations identified defendants who allegedly qualified as ERISA fiduciaries with respect to the disputed plan. (Docket No. 109.) The Court also found that the complaint adequately pled a claim that was not barred by ERISA's exhaustion requirement. (*Id.*)

On June 26 and July 14, 2009, RBC filed motions for summary judgment against the ten individual plaintiffs. (Docket No. 114 (Grattan); Docket No. 119 (Roque);

Docket No. 124 (Pazos); Docket No. 129 (Capozzoli); Docket No. 133 (Cruz); Docket No. 139 (Alvarez); Docket No. 150 (Blumberg-Markus); Docket No. 155 (David); Docket No. 160 (Kuhlman); Docket No. 183 (Kennedy).)  On July 7, 2009, plaintiffs filed a motion to conditionally certify a collective action and to facilitate notice to potential plaintiffs.  (Docket No. 171.)  On July 31, 2009, plaintiffs filed a motion for certification of a California class, a New York class, a Florida class, and an ERISA class. (Docket No. 201.)

## ANALYSIS

### I.  MOTIONS FOR SUMMARY JUDGMENT

#### A.  Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.      FLSA Claims** (Counts 1 and 2)

The FLSA includes federal minimum wage and overtime provisions. The FLSA currently provides a minimum wage of $7.25 per hour. 29 U.S.C. § 206. The minimum wage was $5.85 as of July 24, 2007, increased to $6.55 on July 24, 2008, and increased to $7.25 on July 24, 2009. *Id.* § 206(a)(1). The FLSA also states that if an employee works more than forty hours per week, the employer must provide compensation for the hours in excess of forty "at a rate not less than one and one-half times the regular rate at which" the employee is employed. *Id.* § 207(a)(1). The FLSA exempts several categories of workers from federal minimum wage and overtime requirements. Section 13(a)(1) of the FLSA creates an exemption from the minimum wage and overtime requirements for "any employee employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor] . . . )." *Id.* § 213(a)(1).

**1.      The FLSA Written Consent Requirement for Collective Actions**

Section 216(b) of Title 29 establishes a federal cause of action for employees who allege that their employer has violated the FLSA, but it requires each plaintiff to file written consent with the court. It states that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* § 216(b).

Written consent is compulsory in FLSA collective actions such as this one. As the Seventh Circuit has recognized, each plaintiff in an FLSA collective action must give consent in writing and file that consent with the court:

> The statute is unambiguous: if you haven't given your written consent to join the suit, or if you have but it hasn't been filed with the court, you're not a party. It makes no difference that you are named in the complaint, for you might have been named without your consent. The rule requiring written, filed consent is important because a party is bound by whatever judgment is eventually entered in the case, and if he is distrustful of the capacity of the "class" counsel to win a judgment he won't consent to join the suit. We are inclined to interpret the statute literally. No appellate decision does otherwise.

*Harkins v. Riverboat Servs., Inc.*, 385 F.3d 1099, 1101 (7th Cir. 2004). Other courts have also recognized that "[t]he statutory language is clear. When plaintiffs have filed a 'collective action,' under § 216(b), all plaintiffs, including named plaintiffs, must file a consent to suit with the court in which the action is brought." *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1132-33 (D. Nev. 1999) (footnote omitted). The complaint itself is not sufficient, even if it names the particular plaintiff. *See Harkins*, 385 F.3d at 1101; *Bonilla*, 61 F. Supp. 2d at 1132.

Plaintiffs contend that courts have not required named plaintiffs to make additional filings to formally "opt in" to their own collective actions, but the cases plaintiffs cite draw a distinction between putative collective actions, in which formal written consent filings are required, and individual or joint actions, in which such filings are not required. (*See, e.g.*, Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 34, Docket No. 217.) *See Allen v. Atl. Richfield Co.*, 724 F.2d 1131, 1135 (5th Cir. 1984) ("[O]ther courts have held that named individuals who **jointly filed suit** under the FLSA were not

required to file written consents with the court. We conclude that parties named in a suit, who have hired a lawyer to file a complaint on their behalf, have clearly indicated their consent to suit. The statute does not require additional time-and-resource-consuming filings." (citations omitted; emphasis added)); *Bonilla*, 61 F. Supp. 2d at 1133 ("By contradistinction, a suit which consists of a number of **individual actions joined** under Rule 20(a) of the Federal Rules of Civil Procedure is not a 'collective action,' and plaintiffs need not file a consent to suit in order to commence the action." (emphasis added)). In *Allen v. Atlantic Richfield Co.*, for example, the court emphasized that the plaintiffs had brought individual claims and sought individual relief, and that none of the plaintiffs ever sought to represent others. 724 F.2d 1131, 1135 (5th Cir. 1984). The court concluded that the written consent requirement did not apply because "the action never evolved into a collective or class action." *Id.*

Most of the plaintiffs in this case have always raised their FLSA claims against RBC as part of a collective action, rather than as individual or joint claims. (See Compl. ¶ 2, Docket No. 1 ("This is a nationwide collective action[.]"); Am. Class/Collective Action Compl. ¶ 2, Docket No. 27 ("This is a nationwide collective action[.]"); Consolidated Am. Compl. ¶ 2, Docket No. 43 ("This is a nationwide collective action[.]"); Second Consolidated Am. Compl. ¶ 2, Docket No. 77 ("This is a nationwide collective action[.]").) *See also* Compl. at 4, *Capozzoli v. RBC Dain Rauscher, Inc.*, No. 07-11200 (S.D.N.Y. Dec. 12, 2007) ("Class and Collective Action Allegations"); Compl. at 4, *Pazos v. RBC Dain Rauscher, Inc.*, No. 08-20588 (S.D. Fla. Mar. 6, 2008) ("Class/Collective Action Allegations").

David and Kennedy are two possible exceptions.  Their original complaints, which were initially filed in state court, were putative class actions, but they were not putative collective actions.  *See* Class Action Compl., Docket No. 46, Attachment No. 2, *David v. RBC Dain Rauscher*, No. 06-4402 (D. Minn. Nov. 3, 2006); Class Action Compl., Docket No. 16, Attachment No. 1, *Kennedy v. RBC Dain Rauscher*, No. 07-500 (D. Minn. Jan. 26, 2007).  Therefore, David and Kennedy arguably had no obligation to file a formal written consent in those cases.  *But see* 29 U.S.C. § 216(b) ("An action to recover the liability [under the FLSA] . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.")  Nonetheless, their claims have "evolved into a collective . . . action" because after the cases were transferred and consolidated, some of the named plaintiffs "came forward and filed a written consent to the suit, asking to be made a party plaintiff."  *Cf. Allen*, 724 F.2d at 1135.  Therefore, in order to "preserve [their] right of action **in the collective case**," *Smith v. Cent. Sec. Bureau, Inc.*, 231 F. Supp. 2d 455, 476-77 (W.D. Va. 2002) (emphasis added), David and Kennedy must file a written consent with this Court.

Eight of the ten individual plaintiffs, including Kennedy, have filed a formal written consent with the Court.  On July 16, 2009, Alvarez, Capozzoli, Cruz, Grattan, Kuhlman, Pazos, and Roque filed their written consents with the Court.  (Docket Nos. 191, 193.)  Capozzoli's consent form is dated October 16, 2007, but it appears that she

did not file that consent with the United States District Court for the Southern District of New York. (*See* Docket No. 191 at 4.) The Court has examined the docket in that case and cannot find any indication that the consent was filed there prior to transfer. *See Capozzoli v. RBC Dain Rauscher, Inc.*, No. 07-11200 (S.D.N.Y. Dec. 12, 2007). Therefore the Court concludes that Capozzoli first filed her consent on July 16, 2009. On July 22, 2009, Kennedy filed a written consent with this Court. (Docket No. 195.)

The Court is unable to identify in the record any written consent filed by Blumberg-Markus or David. Blumberg-Markus did not bring her FLSA claims in any other court. Her FLSA claims have always been part of the putative nationwide collective action that is before this Court, and she has not filed a written consent with this Court. As noted above, David first filed his claim in California state court, and RBC removed the action to the Central District of California. The Court has examined the docket in *David v. RBC Dain Rauscher*, No. 06-5941 (C.D. Cal. Sep. 18, 2006), and sees no evidence of a written consent filed with that court. Nor has David filed a written consent with this Court.

Blumberg-Markus has not filed a written consent with the Court, and she therefore has not preserved any right of action under the FLSA. Blumberg-Markus initiated her FLSA claims in this Court on May 24, 2007, when she was named as a plaintiff in the consolidated amended complaint, which identifies the complaint as "a nationwide collective action." (Consolidated Am. Compl. ¶ 2, Docket No. 43.) Therefore, the FLSA prohibits Blumberg-Markus from being a party to the FLSA portion of this action. Blumberg-Markus may, however, file a written notice of consent that could reinstate her

FLSA claims as part of the collective action.  As discussed below, however, her FLSA claims would be time-barred, and she does not object to RBC's motion for summary judgment on her FLSA claims.

Because David has not filed a written consent with the Court, he does not seem to have preserved his right of action in this collective action.  At no time since RBC removed David's case from state court has David asserted any individual claims.  Rather, he has become a plaintiff in a putative FLSA collective action.  He is a named plaintiff in the consolidated amended complaint filed on May 24, 2007, and in the second consolidated amended complaint filed on August 6, 2008.  Both complaints specifically allege that they are putative nationwide collective actions.  David therefore seems to have abandoned any individual FLSA claims he may have raised in state court.  David may, however, file a written notice of consent that could possibly reinstate his FLSA claims as part of the collective action.  Moreover, it is unclear whether the filing of David's class action complaint in state court tolled the statute of limitations and, if so, when his obligation to file a written consent attached.  For reasons discussed below, the Court defers resolution of this issue.

### 2.    The Statute of Limitations for FLSA Claims

Written consent determines not only whether an individual may be a plaintiff in an FLSA collective action, but also whether FLSA claims that are part of a collective action

are barred by the statute of limitations.[3]  The statute of limitations for violations of the FLSA is two years "after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255.  Section 256 governs when an action is commenced for an individual claimant who is party to a collective or class action: "[I]n the case of a collective or class action instituted under the" FLSA, the action

> shall be considered to be commenced in the case of any individual claimant –
>
> (a)    on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b)    if such written consent was not so filed or if his name did not so appear – on the subsequent date on which such written consent is filed in the court in which the action was commenced.

*Id.* § 256; *see also Bonilla*, 61 F. Supp. 2d at 1132-33 ("Although the consents may be filed after the complaint, the action is not deemed commenced with respect to each individual plaintiff until his or her consent has been filed."); *Perella v. Colonial Transit, Inc.*, 148 F.R.D. 147, 149 (W.D. Pa. 1991) ("The statutory language makes clear that the filing of the consent may come after the filing of the complaint, but that a claim is not asserted, for purposes of the statute of limitations, until both the complaint and the claimant's individual written consent are filed.").

---

[3] Plaintiffs assert in passing that the statute of limitations would be tolled if RBC failed to display a proper Department of Labor poster advising employees of their FLSA rights.  (*See, e.g.*, Pl. Capozzoli's Resp. to Def.'s Mot. for Summ. J. at 33 n.27, Docket No. 213.)  Plaintiffs carry the burden of establishing that they are entitled tolling, and they have failed to come forward with any evidence in support of this argument.  The Court therefore finds that plaintiffs have not established that RBC's alleged failure to display Department of Labor posters tolled the statute of limitations.

None of the individual plaintiffs filed written consent on the date the complaint was filed. Therefore, for purposes of the FLSA statute of limitations, the FLSA claims commenced for Alvarez, Capozzoli, Cruz, Grattan, Kuhlman, Pazos, and Roque on July 16, 2009, and for Kennedy on July 22, 2009. Assuming for purposes of summary judgment that plaintiffs will be able to show that RBC acted willfully, any claims that accrued prior to July 2006 are time-barred.[4]

Alvarez, Capozzoli, Cruz, Grattan, Kennedy, Kuhlman, Pazos, and Roque were employed at RBC prior to July 2006 but continued to be employed there after July 2006, and therefore their claims are partially but not entirely time-barred. Blumberg-Markus, however, stopped working for RBC in December 2002, and therefore her FLSA claims are entirely time-barred. (*See* Blumberg-Markus Dep. at 32.) David stopped working for RBC in June 2005, and therefore, even if David were to file written consent immediately, his FLSA claims in the collective action would appear to be entirely time-barred. As discussed above, however, on July 27, 2006, David filed a complaint in California state court, and that complaint was not a putative collective action. The parties have not addressed when David's claim commenced or whether he may maintain any individual FLSA claims alongside this collective action, particularly in light of the fact that David's original claim was a class action and the Court has now denied plaintiffs' motion for

---

[4] The Court therefore does not consider, with respect to the FLSA claims, plaintiffs' arguments relating to RBC's commission and bonus compensation system prior to July 2006. (*See, e.g.*, Resp. to Mot. for Summ. J. at 14, Docket No. 217.)

class certification.  The Court defers resolution of the issue of whether David's FLSA claims are time-barred.

### 3.    FLSA Regulations Governing White Collar Exemptions

As mentioned above, the FLSA exempts from minimum wage and overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity"  29 U.S.C. § 213(a)(1).  FLSA regulations also exempt "highly compensated employees," defined as employees who have "total annual compensation of at least $100,000" and who "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee."  29 C.F.R. § 541.601(a).

Part 541 of the Secretary of Labor's FLSA regulations defines and delimits the exemptions for executive, administrative, professional, computer and outside sales employees.  29 C.F.R. pt. 541.  Subpart A contains general regulations, including definitions of certain terms used in the regulations.  *See id.* §§ 541.0 *et seq.*  Subpart C governs administrative employees.  *See id.* §§ 541.200 *et seq.*  Subpart D governs professional employees.  *See id.* §§ 541.300 *et seq.*  Subpart G contains salary requirements for the various exempt categories and adds the exemption for highly compensated employees.  *See id.* §§ 541.600 *et seq.*  Subpart H contains definitions of key terms, including "primary duty" and "customarily and regularly."  *See id.* §§ 541.700 *et seq.*

Given the remedial nature of the FLSA, exemptions under the Act are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *cf.* 5 C.F.R. § 551.202(b) ("[FLSA] [e]xemption criteria must be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption." (regulation applicable to civil service employees)). Consistent with this principle, the employer has the burden of establishing that it is entitled to the benefit of an exemption and excused from the general overtime payment provision. *Mitchell v. Ky. Fin. Co.*, 359 U.S. 290, 291 (1959); *Reich v. Newspapers of New Eng., Inc.*, 44 F.3d 1060, 1070 (1st Cir. 1995); *cf.* 5 C.F.R. § 551.202(c) ("The burden of proof rests with the agency that asserts the exemption." (regulation applicable to civil service employees)). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law[.]" *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

RBC claims that Alvarez falls within the learned professional exemption, that Alvarez, Blumberg-Markus, Capozzoli, Cruz, David, Kennedy, and Kuhlman fall within the administrative exemption, and that Grattan, Kuhlman, Pazos, and Roque fall within the highly compensated employee exemption.

### 4.    Learned Professional Exemption (Subpart D)

RBC argues that Alvarez falls within the learned professional exemption. The FLSA regulations define "[t]he term 'employee employed in a bona fide professional capacity' in section 13(a)(1) of the Act" to "mean any employee:

> (1)    Compensated on a salary or fee basis at a rate of not less than $455 per week . . . , exclusive of board, lodging, or other facilities; and
>
> (2)    Whose primary duty is the performance of work:
>
> > (i)    Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction . . . .

29 C.F.R. § 541.300(a).

FLSA regulations provide this "learned professional exemption" for an employee whose "primary duty" is "the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." *Id.* § 541.301(a). The "primary duty test" for learned professionals consists of three elements: "(1) The employee must perform work requiring advanced knowledge; (2) The advanced knowledge must be in a field of science or learning; and (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." *Id.*

The regulations define "work requiring advanced knowledge" to mean "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work

requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. Advanced knowledge cannot be attained at the high school level." *Id.* § 541.301(b).

The phrase "field of science or learning" "includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning." *Id.* § 541.301(c).

The regulations define the phrase "customarily acquired by a prolonged course of specialized intellectual instruction" to "restrict[] the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession." *Id.* § 541.301(d). The regulation explains:

> The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. . . . However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

*Id.*

The regulations recognize that "[t]he areas in which the professional exemption may be available are expanding." *Id.* § 541.301(f). "As knowledge is developed,

academic training is broadened and specialized degrees are offered in new and diverse fields, thus creating new specialists in particular fields of science or learning. When an advanced specialized degree has become a standard requirement for a particular occupation, that occupation may have acquired the characteristics of a learned profession." *Id.*

On May 25, 2006, RBC hired Alvarez as a Salesperson in the Institutional Sales Department of the Fixed Income Group. (Wells Ex. 77, Docket No. 231.) At the time, Alvarez had ten years of experience in the financial services industry, a Series 7 license, and a Master's in Business Administration from the University of Miami. (Alvarez Dep. at 24, 112, 128.) RBC required Alvarez to have his Series 7 license within ninety days of hire. (Wells Ex. 77, Docket No. 231.) RBC paid Alvarez a percentage of the gross sales credits from his sales. (Alvarez Dep. at 106.)

Alvarez testified that he performed all seven of the Series 7 critical functions as part of his work at RBC. (*Id.* at 126.) He testified that he participated in continuing education in order to maintain his Series 7 license. (*Id.* at 128.) He also testified that he did not think that his MBA was "a requirement" or "g[ave] [him] a leg up . . . on somebody else that doesn't have an MBA." (*Id.* at 129.) He conceded that his MBA assisted him in working in the industry because it gave him "a very strong, solid fundamental on the financial markets and securities in general," but he testified that it did not necessarily give him any sort of competitive advantage over registered representatives who did not have an MBA. (*Id.* at 129-30.)

There is a genuine fact issue as to whether, under the primary duty test in 29 C.F.R. § 541.301(a), any advanced knowledge Alvarez used is "customarily acquired by a prolonged course of specialized intellectual instruction." *Id.* § 541.301(a)(3). The Court assumes for purposes of summary judgment that Alvarez satisfies the compensation requirements in § 541.300(a)(1), and that Alvarez satisfies the first two elements of the primary duty test. RBC has failed to show that, as a matter of law, Alvarez's profession is one "where specialized academic training is a standard prerequisite for entrance into the profession." *Id.* § 541.301(d). Viewing the facts in a light most favorable to plaintiffs, much of the specialized knowledge that Alvarez uses in conducting his primary work duties is customarily acquired through on-the-job training and experience. The specialized knowledge acquired for the Series 7 examination does not involve a "prolonged course of specialized intellectual instruction" akin to the specialized instruction required to obtain an advanced degree. A trier of fact could also conclude that the instruction is not "intellectual" but instead simply informs people about the laws, rules, and regulations governing their work. Moreover, Alvarez's testimony demonstrates that others in his profession did not hold an MBA and that he gained no advantage over them by having this advanced degree. The Court finds that, viewing the facts in a light most favorable to Alvarez, RBC is not entitled to summary judgment on the basis that Alvarez falls within the professional exemption.

### 5. Administrative Exemption (Subpart C)

RBC argues Alvarez, Blumberg-Markus, Capozzoli, Cruz, David, Kennedy, and Kuhlman fall within the administrative exemption. The FLSA regulations define "[t]he term 'employee employed in a bona fide administrative capacity' in section 13(a)(1) of the Act" to mean an employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). The Court therefore must examine, for all of the employees alleged to fall within the administrative exemption, their compensation, whether their primary duties are directly related to the management or general business operations of RBC or RBC's customers, and whether their primary duties include the exercise of discretion and independent judgment. The Court first discusses these requirements and the relevant regulatory language, and then examines whether the seven employees qualify for the exemption.

### a. First Requirement: Compensation on a Salary Basis of Not Less than $455 Per Week

Department of Labor regulations govern the types of compensation arrangements that satisfy the first requirement. *See id.* § 541.604. One means of compensation is payment on a "salary basis." *Id.* § 541.602(a). An employee is paid on a salary basis "if

the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." *Id.*

So long as "the employment arrangement . . . includes a guarantee of at least the minimum weekly-required amount paid on a salary basis," the employer may also provide the employee with additional compensation, including compensation in the form of a commission on sales. *Id.* § 541.604(a).

Plaintiffs do not dispute that they earned compensation of at least $455 per week. (*See, e.g.*, Mem. in Supp. of Def.'s Mot. for Summ. J. at 1, Docket No. 116; Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 10-17, Docket No. 217.) They argue, however, that most or all of that compensation was based on commissions, and therefore securities brokers were not salaried employees eligible for any exemption. (*See, e.g.*, Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 8-9, Docket No. 217.) They argue that any "salary" of $455 per week "must be 'free and clear,' without regard to the employee's productivity." (*Id.* at 14.) Because RBC used a "base commission" system that was subject to offsets and adjustments for expenses such as payments for support personnel, business-account expenses, and trading-error charges, they argue that the base commissions were not "free and clear" and could not be considered salary.

The Department of Labor expressly rejected plaintiffs' "free and clear" argument, and the Court defers to the Department's interpretation of its regulations. On November 27, 2006, the Department of Labor issued an opinion letter "regarding whether

certain 'registered representatives' in the financial services industry qualify for the administrative exemption under section 13(a)(1) of the [FLSA] and 29 C.F.R. Part 541." Dep't of Labor, Opinion Letter, FLSA2006-43 (Nov. 27, 2006) ("November 2006 Opinion Letter" or "Opinion Letter").  As described in greater detail below, the Opinion Letter discusses the duties of registered representatives and whether registered representatives generally qualify for the administrative exemption.

The Opinion Letter describes a commission model for compensating registered representatives, and concludes that registered representatives who are compensated according to such a model are paid on a salary basis for purposes of satisfying the minimum salary requirement of the administrative exemption.  *Id.* at 2, 6-7.  Under that model, the registered representative and the employer split the fees paid by clients, and the "calculation [of compensation] may also take into account certain adjustments for cancelled trades, trade errors, expenses, and other trading-related losses," but those adjustments do not affect the payment of the guaranteed minimum amount of at least $455 per week.  *Id.* at 2-3.  The letter then describes a

> reconciliation process between the salary/draw and fee/commission components, *i.e.*, the relevant formula for calculating the commissions or fees may take into account the predetermined minimum amounts paid to a registered representative in the current and/or previous pay periods.  The formula to calculate commissions may also adjust for cancelled trades, trade errors, expenses and other trading-related losses, which affect only the calculation of commissions but not the payment of the guaranteed minimum amount of at least $455 per week.

*Id.* at 3.  The Opinion Letter notes that this "reconciliation process . . . between the formula for calculating excess commissions or fees above the guaranteed predetermined

minimum amount does not result in a reduction in the guaranteed predetermined minimum amount paid to the registered representatives." *Id.* at 7. "[B]ecause the employment arrangement includes a guarantee of at least the required amount paid on a salary basis, the registered representative's compensation structure, as described, meets the salary basis requirements for exemption" in § 541.604(a). *Id.* The Opinion Letter emphasizes that "[w]hat matters is that the employee receives no less than the weekly-required amount as a guaranteed salary constituting all or part of total compensation, which amount is not subject to reduction due to the quality or quantity of the work performed, and that the employee is never required to repay any portion of that salary even if the employee fails to earn sufficient commissions or fees." *Id.* at 7 n.5. "Provided that these requirements are met, the employee will be considered to be paid 'on a salary basis' irrespective of any . . . additional sums paid to the employee, such as the amount by which commissions earned for a specific period exceed the total weekly guarantee paid for the same period." *Id.* at 8 n.5. The Opinion Letter recognizes that previous opinion letters had "suggest[ed] that the requirement that a salary basis payment be made 'free and clear' is not satisfied under" certain offset plans, and concludes that, "[t]o the extent these . . . prior opinion letters are inconsistent with the interpretation of 'free and clear' payment on a 'salary basis' expressed in this opinion letter, they are hereby withdrawn."[5] *Id.* at 7 n.5.

---

[5] The Court therefore finds that the two earlier opinion letters that plaintiffs cite do not determine the outcome of this issue. (*See* Resp. to Mot. for Summ. J. at 14-16, Docket No. 217.)

The Court finds persuasive the Department of Labor's interpretation of the salary basis requirements under § 541.604(a). "[A]n opinion of the Administrator of the Wage and Hour Division of the Department of Labor has persuasive value if the position of the Administrator is well-considered and well-reasoned." *Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.*, 204 F.3d 673, 677 (6th Cir. 2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Plaintiffs contend that "[t]he credibility of the November 2006 Department of Labor Opinion Letter is clearly questionable as the author to the Opinion Letter, Paul DeCamp, was still listed as an attorney for Gibson, Dunn & Crutcher on the firm's website at the time the Opinion Letter was authored. Notably, Gibson, Dunn & Crutcher is a prominent defense firm with an extensive wage and hour practice group." (Wells Decl. ¶ 7, Docket No. 231.) Plaintiffs further contend that the Opinion Letter is not entitled to any deference because it is based on specific facts presented to the Department, and because it concludes that financial representatives **may** qualify for the administrative exemption. Plaintiffs do not identify, however, any flaws in the reasoning of the Opinion Letter or any particular reason to find it unpersuasive or inapplicable to the compensation system that RBC used with its securities brokers. The opinions contained in the Opinion Letter are well-considered and well-reasoned, and therefore the Court defers to the Department of Labor's analysis.

The Court finds that RBC's method of compensating securities brokers by means of commissions and a guaranteed level of compensation is not substantively distinguishable from the method of compensation described in the Opinion Letter and approved by the Department of Labor. The Court therefore concludes that, to the extent

RBC guaranteed that its securities brokers would receive compensation of at least $455 per week, that compensation satisfies the requirements of 29 C.F.R. § 541.200(a)(1) for the administrative exemption.

### b. The Term "Primary Duty"

The term "primary duty" appears in the second and third requirements for the administrative exemption. *See* 29 C.F.R. § 541.200(a)(2)-(3). The regulations define the term primary duty as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). The regulations explain that a "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* In making that determination, courts may consider, among other things:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*

### c. Second Requirement: Primary Duty to Perform Work Directly Related to the Management or General Business Operations of RBC or RBC's Customers

The second and arguably most contentious requirement for the administrative exemption is that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). "To meet this

requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a). The regulations explain that "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . finance; accounting; . . . marketing; research; . . . legal and regulatory compliance; and similar activities." *Id.* § 541.201(b). This work may be directly related to the management or general business operations of the employer's own customers. *Id.* § 541.200(a)(2). "Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." *Id.* § 541.201(c).

### d. Third Requirement: Primary Duty Includes Exercise of Discretion and Independent Judgment with Respect to Matters of Significance

The third requirement for the administrative exemption is that the employee's primary duty must "include[] the exercise of discretion and independent judgment with respect to matters of significance." *Id.* § 541.200(a)(3).

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." *Id.*

§ 541.202(c). Those choices need not be final. "The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.* "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* § 541.202(a).

The regulations provide an unexhaustive list of factors that courts may consider in determining whether an employee exercises discretion and independent judgment with respect to matters of significance:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).

### e. Regulatory Examples Applicable to the Financial Services Industry in 29 C.F.R. § 541.203(b)

The relevant "[a]dministrative exemption examples" make specific reference to employees in the financial services industry:

Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

*Id.* § 541.203(b).

### f.    Regulatory Revisions in 2004

Prior to August 23, 2004, somewhat different regulations governed the administrative exemption. These earlier regulations made repeated reference to "customers' brokers in stock exchange firms." For example, 29 C.F.R. § 541.201 described three types of employees qualifying as administrative employees. The third type of employee was "[t]hose who perform special assignments," as provided in § 541.2(c)(3), and the regulation specified that "[t]his classification . . . includes employees whose special assignments are performed entirely or partly inside their employer's place of business," including "special organization planners, **customers' brokers in stock exchange firms**, so-called account executives in advertising firms and contact or promotion men of various types." 29 C.F.R. § 541.201(a)(3)(ii) (2003) (emphasis added).

In describing what is now the second requirement, which at the time stated that the employee's primary duty must consist of "[t]he performance of office or nonmanual work directly related to management policies or general business operations of [the

employee's] employer or his employer's customers," *id.* § 541.2(a)(1) (2003), the regulations explained that this requirement is "met by many persons employed as advisory specialists and consultants of various kinds, . . . **customers' brokers in stock exchange firms**, promotion men, and many others." *Id.* § 541.205(c)(5) (2003) (emphasis added). The regulations listed "financial consultants" as a "[t]ypical instance[]" of bona fide administrative employees performing "important functions as advisers and consultants but [who] are employed by a concern engaged in furnishing such services for a fee." *Id.* § 541.205(d) (2003).

In describing what is now the third requirement, which at the time stated that the employee must "customarily and regularly exercise[] discretion and independent judgment," *id.* § 541.2(b) (2003), the regulations stated that this language "contemplate[s] . . . the kind of discretion and independent judgment exercised by **a customer's man in a brokerage house** in deciding what recommendations to make to a customer for the purchase of securities." *Id.* § 541.207(d)(2) (2003) (emphasis added).

The Department of Labor promulgated revised rules in 2004. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122 (Apr. 23, 2004) (codified at 29 C.F.R. pt. 541). The Department's guidance accompanying the final rules included a survey of the "growing litigation" in the "financial services industry" regarding the administrative exemption. *Id.* at 22145. The Department responded to those litigation developments by crafting the examples of exempt financial services employees in § 541.203(b), as discussed in the previous subsection:

The Department agrees that employees whose primary duty is inside sales cannot qualify as exempt administrative employees. However, as found by the *John Alden*, *Hogan* and *Wilshin* courts, many financial services employees qualify as exempt administrative employees, even if they are involved in some selling to consumers. Servicing existing customers, promoting the employer's financial products, and advising customers on the appropriate financial product to fit their financial needs are duties directly related to the management or general business operations of their employer or their employer's customers, and which require the exercise of discretion and independent judgment.

Accordingly, consistent with this case law, the final rule distinguishes between exempt and nonexempt financial services employees based on the primary duty they perform.

*Id.* at 22146. The explanation accompanying the new rules emphasized that "[t]he final rule distinguishes the exempt and nonexempt financial services employees based on the duties they perform, not the identity of the customer they serve. For example, a financial services employee whose primary duty is gathering and analyzing facts and providing consulting advice to assist customers in choosing among many complex financial products may be an exempt administrative employee. An employee whose primary duty is inside sales is not exempt." *Id.*

The Department stated that the financial services examples in § 541.203(b) are "consistent with existing section 541.207(d)(2), which provides that 'a customer's man in a brokerage house' exercises discretion and independent judgment 'in deciding what recommendations to make to customers for the purchase of securities,' but reflects the modernization of this existing subsection for the 21st Century workforce." *Id.*

### g.     The November 2006 Opinion Letter

The November 2006 Opinion Letter, discussed in Part I.B.5.a in the context of the salary basis requirement, also concludes that registered representatives with certain job duties qualify for the administrative exemption.   The Opinion Letter states that these registered representatives work in the "securities/financial services industry" and have a variety of titles, including "account executives, broker-representatives, financial executives, financial consultants, financial advisors, investment professionals, and stockbrokers." November 2006 Opinion Letter at 1.  Their employers require them to "be registered with a self-regulatory organization such as the New York Stock Exchange" or NASD.  *Id.*  "To become 'registered,' employees must pass a qualification examination, the most common of which is the 'Series 7.'"  *Id.*  The Opinion Letter describes the various topics covered by the Series 7.  The Opinion Letter then notes that "the rules of the NASD and the NYSE require registered representatives to conduct diligence into each individual client's financial situation in order to recommend only those securities that are suitable for the client's particular financial status, objectives, risk tolerance, tax exposure, and the like."  *Id.*  The Opinion Letter then describes in great detail the type of duties performed by these registered representatives.  *Id.* at 1-2.

The Opinion Letter concludes that registered representatives who perform the tasks described in the letter have as their primary duty the performance of work directly related to the management or general business operations of the employer or the employer's customers within the meaning of the second requirement for the administrative exemption.  *See id.* at 3-5.  The Opinion Letter states that the

description of the duties of these registered representatives suggests that they have a primary duty other than sales, because their work includes collecting and analyzing a client's financial information, advising the client about the risks and the advantages and disadvantages of various investment opportunities in light of the client's individual financial circumstances, and recommending to the client only those securities that are suitable for the client's particular financial status, objectives, risk tolerance, tax exposure, and other investment needs.

*Id.* at 5. Therefore, the Opinion Letter concludes that "these registered representatives satisfy the duties requirement under 29 C.F.R. § 541.203(b)." *Id.*

The Opinion Letter further concludes, under the third requirement for the administrative exemption, that "the primary duty of the registered representatives . . . includes the exercise of discretion and independent judgment with respect to matters of significance." *Id.* at 6. "The duties of the registered representatives . . . include evaluating the client's individual financial circumstances and investment needs and assessing and comparing the alternatives before making recommendations for investment options to the client, which satisfies this element of the administrative exemption." *Id.*

The Opinion Letter also concludes that "the registered representatives . . . satisfy the requirements of the administrative exemption under both the pre-2004 and current regulations." *Id.* at 8. The letter notes that "the criteria in the duties test for the administrative exemption in the 2004 revised final regulations are substantially the same as under the prior rule, [and therefore] the outcome of this opinion would be essentially identical under either version of the regulations." *Id.*

For the reasons discussed in Part I.B.5.a, the Court finds persuasive the Department of Labor's interpretation of the regulations governing the administrative

exemption in 29 C.F.R. § 541.200(a) as they pertain to registered representatives. The Court recognizes, however, that it must apply the regulatory language "in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). The Court therefore must conduct an independent analysis of the particular employment situations of each of the plaintiffs that RBC claims to qualify for the administrative exemption.

### h. Common Arguments Advanced by Plaintiffs

In response to RBC's motions for summary judgment, plaintiffs advance several common arguments related to the administrative exemption. First, they argue that summary judgment is inappropriate because each plaintiff's "job duties are clearly in dispute." (*See, e.g.*, Pl. Alvarez's Resp. to Def.'s Mot. for Summ. J. at 9, Docket No. 210.) They contend that *Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100 (S.D. Cal. 2006), presented "the same legal question posed in nearly identical circumstances here," and found that summary judgment was not appropriate because there was a genuine issue of material fact regarding the plaintiff-stock broker's status as an administratively exempt employee. (*See, e.g.*, *id.* at 10.) Second, they argue that because RBC compensated securities brokers based exclusively on sales, then sales "must conclusively be the trait or characteristic that RBC values most," and therefore sales must be a securities broker's primary duty. (*See, e.g.*, *id.* at 12-13.) Third, they argue that registered representatives have a duty to the client "only . . . up until the completion of the sale of the securities," as contrasted with a registered investment advisor, who has "an

affirmative fiduciary duty throughout the relationship with the client." (*See, e.g.*, *id.* at 15.) Therefore, plaintiffs argue, any advice a registered representative gives to a client is "ancillary to the sale." (*See, e.g.*, *id.*) Fourth, plaintiffs argue that RBC does not market its own financial products, and therefore plaintiffs were not engaged in "'marketing, servicing or promoting [their] employer's financial products.'" (*See, e.g.*, *id.* at 20 (quoting 29 C.F.R. § 541.203(b)).) They argue that other cases have drawn a distinction between individuals who are responsible for marketing their employer's own products, and therefore who are arguably engaged in work directly related to the management or general business operations of the employer, and those who sell a third party's products. (*See, e.g.*, *id.* at 20-21.) They note that the November 2006 Opinion Letter makes reference to "promoting **the employer's** financial products" as one of the factors supporting the Department's conclusion that the registered representative's duties described in the letter qualified for the administrative exemption. (*See, e.g.*, *id.* at 23 (quoting November 2006 Opinion Letter).) Before turning to the applicability of the administrative exemption to the individual plaintiffs, the Court addresses these four common arguments.

First, plaintiffs are incorrect to suggest that summary judgment is always inappropriate where there is some dispute as to an employee's job duties. *See Hein v. PNC Fin. Servs. Group, Inc.*, 511 F. Supp. 2d 563, 572 (E.D. Pa. 2007) ("The parties have not disputed Plaintiff's actual duties, only the characterization of those duties."). For example, when a plaintiff's uncontroverted sworn testimony establishes that the plaintiff's "primary duty is the performance of . . . work directly related to the

management or general business operations of the employer or the employer's customers," 29 C.F.R. § 541.200(a)(2), summary judgment may be appropriate. *See Icicle Seafoods*, 475 U.S. at 714 ("The question whether [plaintiffs'] particular activities excluded them from the overtime benefits of the FLSA is a question of law[.]"); *cf. Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1123-24, 1128 (9th Cir. 2002) ("The record contains evidence which could support contrary findings regarding the nature of Bothell's work."). Here, for example, there is no dispute that all of the named plaintiffs spent most of their time interacting with current clients and doing research about particular investment opportunities. In *Takacs*, by contrast, the parties agreed that the plaintiffs spent more than half of their time cold-calling and prospecting for clients. 444 F. Supp. 2d at 1112. Moreover, the defendants in *Takacs* relied on job titles and job descriptions, rather than on the employees' own deposition testimony in which they described how they spent their time at work. *Id.* at 1111-12. Here, defendants have made a much stronger evidentiary showing than the defendants in *Takacs*.

Second, RBC's commission-based compensation structure is not dispositive. In *Casas v. Conseco Finance Corp.*, No. 00-1512, 2002 WL 507059, at *7-9 (D. Minn. Mar. 31, 2002), the court considered compensation structure as one factor among many in determining that certain home loan originators did not qualify for the administrative exemption. The court also noted that the loan originators' job duties "required them to follow [the employer's] standard operating procedures and guidelines and determine whether a customer's financial criteria and loan needs fit within one of [the employer's] existing loan options." *Id.* at *7. Unlike RBC's securities brokers, who have a broad and

evolving universe of investment options to research and to recommend to clients, the loan originators in *Casas* sold exclusively the loan products of their employer. *See id.* at *7-8. The court suggested that the loan originators were engaged in "routine selling efforts focused simply on particular sales transactions." *Id.* at *9 (internal quotation marks omitted). The types of duties that RBC's securities brokers have with respect to their clients are not the types of "routine selling efforts" that a home loan originator has with a homeowner in the context of a single, one-off transaction. Moreover, the court in *Casas* did not have the benefit of the updated Department of Labor regulations or the November 2006 Opinion Letter, both of which suggest that compensation structure is less important than the day-to-day activities of individual employees. Finally, there may be a factual dispute as to whether particular employees were compensated based on commissions, fees for assets under management, or a combination of those factors. (*See, e.g.*, Reply in Supp. of Mot. for Summ. J. at 6, Docket No. 155; Kennedy Dep. at 283-84.)

Third, a registered representative's limited fiduciary duties to a client do not determine, as a matter of law, what a particular registered representative's primary duties are. As RBC notes, a registered representative must make suitable recommendations, and in making such recommendations the registered representative must gather a variety of information and must consider a wide range of factors relevant to the investor and the proposed investments. The purported temporal limitation on a registered representative's duties to the client does not preclude a finding that the registered representative's primary duty is administrative. *See, e.g.*, November 2006 Opinion Letter. Moreover, a registered representative who wishes to maintain and foster client relationships in anticipation of

future sales would likely consider suitability and other compliance issues throughout the client relationship, regardless of whether a sale is pending and regardless of whether a formal fiduciary duty exists.

Fourth, the production/administration dichotomy, which is supposed to "clarify the phrase 'work directly related to the management policies or general business operations'" in the pre-2004 regulations, is not particularly relevant or helpful to the Court's understanding of the primary duties of RBC's securities brokers under current law. *See Bothell*, 299 F.3d at 1126. *Takacs*, for example, discussed the dichotomy as it appeared in the regulations that were in place up until 2004. 444 F. Supp. 2d at 1111. Even in that context, however, *Takacs* recognized that it is not appropriate to rely on the dichotomy "where work does not fall squarely on the 'production' side of the line." *Id.* (some internal quotation marks omitted). *Casas*, on which plaintiffs rely, hinges on the court's application of this dichotomy, which the Department of Labor subsequently removed from the regulations. 2002 WL 507059, at *8-9. As the Seventh Circuit subsequently noted, "the so-called production/administrative dichotomy – a concept that has an industrial age genesis – is only useful by analogy in the modern service-industry context." *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008). As the court explained in the context of certain insurance claim processors:

> The analogy is not terribly useful here, particularly given that the 2004 regulations suggest a more traditional meaning of "production." The new regulations state that the "directly related" test is met by employees who "assist[ ] with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a) (2006). [Material Damage Appraisers] are obviously neither working on

> a manufacturing line nor "producing" anything in the literal sense. They
> are **service providers**, and the service they provide is the administration
> of insurance claims.

*Id.* at 872-73 (emphasis added); *cf. Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 10

(1st Cir. 1997) (recognizing that the employer's "principal production activity [was] the

creation of insurance policies"). The Court finds the production/administrative

dichotomy similarly unhelpful in assessing whether securities brokers – particularly those

who work for an employer that engages in the business of providing financial **services**,

rather than providing particular investment **products** – are engaged in work that is

directly related to management or general business operations of the employer or its

customers.

The fact that RBC provides financial services, rather than financial products, does

not automatically render its employees ineligible for the administrative exemption, as

plaintiffs suggest. The work of RBC's securities brokers may be "directly related to the

management or general business operations" of RBC or RBC's customers, regardless of

the source of the financial products involved with that work. *Cf. Casas*, 2002 WL

507059, at *9 (concluding "that plaintiffs are production rather than administrative

employees" because their employer's "primary business is to design, create and sell home

lending products," and because the loan originators' "primary duty is to sell these lending

products"). The phrase "marketing, servicing or promoting the employer's financial

products" in 29 C.F.R. § 541.203(b) does not preclude a finding that a securities broker is

exempt when marketing, servicing or promoting the employer's financial services or the

financial products offered by other entities.

i. **Applicability of the Administrative Exemption to Individual Plaintiffs**

**Alvarez**

There is no genuine issue of fact that Alvarez satisfies the compensation requirement in 29 C.F.R. § 541.200(a)(1). Plaintiffs do not dispute that Alvarez received compensation of at least $455 per week during his employment at RBC. (Pl. Alvarez's Resp. to Def.'s Mot. for Summ. J. at 11-23, 28-34, Docket No. 210.) Plaintiffs concede that RBC implemented a "minimum compensation" policy beginning in 2005. (*Id.* at 29.) They argue, however, that the policy allowing for a draw against commission "fails to satisfy the salary requirements of the FLSA regulations." (*Id.*) As discussed in Part I.B.5.a, RBC's compensation structure complies with FLSA regulations because it guarantees that employees such as Alvarez will receive compensation of at least $455 per week. The Court finds this analysis applicable to all plaintiffs.

Plaintiffs argue that Alvarez does not satisfy the second requirement in § 541.200(a) because his primary duty "was selling financial products on behalf of RBC."[6] (*Id.* at 12.)

Alvarez testified in his deposition that "most of [his] time was on the phone, speaking to customers." (Alvarez Dep. at 132.) He testified that in every situation all of his clients were analyzing the suitability of particular investments themselves. (*Id.* at 49.) He testified that he "never planned anything as far as their strategy is concerned." (*Id.* at

---

[6] Plaintiffs do not dispute that Alvarez satisfies the third requirement. (*See* Pl. Alvarez's Resp. to Def.'s Mot. for Summ. J. at 11-23, Docket No. 210.)

142.)  He testified that "[v]ery, very few" clients shared with him their "internal set of guidelines that defines the types of investments that they make." (*Id.* at 34.)  He understood that FINRA rules required him to put the interests of his customers before his own interests, and he testified that he did this by making his customers "aware of some of the risks that are involved" with a particular investment.  (*Id.* at 42.)  He testified that if a customer persisted in wanting to make an investment and he did not "agree[] 100 percent on it," then he would simply "make sure that they fully understand what they're doing." (*Id.* at 42-43.)  In the end, however, he stated that "institutional customers are fairly sophisticated, fairly market savvy, so they know exactly what they want to do, and you try to comply." (*Id.* at 43.)

Alvarez testified that from June 2006 through September 2007, he made seven to ten business trips to countries in Central and South America, and that the purpose of those trips was "[t]o have a better relationship with the customers and to prospect for new customers." (*Id.* at 66-67.)  He forwarded marketing presentations to prospective customers, but he did not have the authority to modify the marketing material.  (*Id.* at 70.) Alvarez testified that he spent between thirty minutes and "a couple of hours" reading reports from RBC's research and analytics department so that he could stay abreast of market conditions, news, and events.  (*Id.* at 116-17.)  He then used that information to provide customers with "market color" so that he could build a stronger relationship with them and thereby increase sales with them.  (*Id.* at 116.)

Based on Alvarez's deposition testimony, the Court finds that a reasonable trier of fact could conclude that Alvarez's primary duties were to sign on new clients and to

effectuate sales for existing clients and therefore that Alvarez did not fall within the administrative exemption. Alvarez spent most of his day on the telephone with clients, responding to their inquiries and informing them of the risks involved with certain investments. *Cf. Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 905 (3d Cir. 1991) (finding that the district court did not clearly err when it rejected the employer's argument that inside salespersons are administrative employees who "promote sales," where the salespersons provided advice to customers with respect to additional products "in the context of discrete, particularized sales transactions"). There is a genuine issue of material fact regarding whether Alvarez merely complied with client wishes by effectuating transactions for them or whether his primary duties were similar to those described in the November 2006 Opinion Letter and 29 C.F.R. § 541.203(b). The Court concludes that RBC has failed to meet its burden with respect to Alvarez's FLSA claims.

**Blumberg-Markus**

As discussed above, Blumberg-Markus's FLSA claims are time-barred. She "does not oppose Defendant's motion with respect to her claims under the FLSA." (Pl. Blumberg-Markus' Resp. to Def.'s Mot. for Summ. J. at 1 n.2, Docket No. 223.) The Court therefore grants RBC's unopposed motion for summary judgment as to Blumberg-Markus on Counts 1 and 2 of the second consolidated amended complaint.

**Capozzoli**

Plaintiffs argue that Capozzoli does not satisfy the second requirement under 29 C.F.R. § 541.200(a) because her primary duty was sales.[7]  (Pl. Capozzoli's Resp. to Def.'s Mot. for Summ. J. at 16, Docket No. 213.)  They argue that Capozzoli's "[c]ompliance activity [with respect to FINRA regulations and the seven critical functions] only arose to the extent required by her primary sales activities of prospecting new clients and recommending transactions."  (*Id.* at 18-19.)  They further argue that her "research, analysis and fact-gathering activity . . . [was] also clearly subordinate to her primary duty of sales."  (*Id.* at 19.)

Capozzoli testified in her deposition that her "[d]uties primarily w[ere] sales, to generate business, generate commissions, bring in new money.  That was my main role.  Anything evolving around that as far as let's say sending out a research report, sending out a portfolio review as all tied to that goal of generating more commissions and business."  (Capozzoli Dep. at 141-42.)  Capozzoli spent "the better part of the day" "[c]ommunicating with the clients, e-mail, phone, [and] in-person meetings."  (*Id.* at 39.)  Most of Capozzoli's clients were individuals.  (*Id.* at 53-54.)  If Capozzoli came up with a new investment idea, she called clients and told them that she thought they "should add some to [their] portfolio."  (*Id.* at 64.)  In dealing with institutional accounts, Capozzoli viewed her job as one that "is more which product, do they buy bonds do they buy stocks, do they buy convertibles, do they do options.  Once I know what they buy, then I give

---

[7] Plaintiffs do not dispute that Capozzoli satisfies the third requirement.  (*See* Pl. Capozzoli's Resp. to Def.'s Mot. for Summ. J. at 14-25, Docket No. 213.)

them ideas for an order." (*Id.* at 74.) If a customer wanted a lot of international investments, for example, she took more time to look at each economy, currency values, and other considerations. (*Id.* at 39.) She testified that she spent "[p]ossibly four to five hours a day" conducting research about the appropriate components for a particular client portfolio. (*Id.*) She acknowledged that under FINRA's Know Your Customer rules, she was required to understand "as much about the customer's financial situation and even partially personal situation to make proper recommendations as a registered representative." (*Id.* at 26.)

The Court finds that, viewing the evidence in a light most favorable to Capozzoli, a reasonable trier of fact could conclude that Capozzoli's primary duty was to sell financial products, thereby making her ineligible for the administrative exemption. *See* 29 C.F.R. § 541.203(b). There are genuine issues of fact regarding whether Capozzoli served primarily as an adviser and consultant to RBC's customers or whether she primarily sold those customers financial products. *See id.* § 541.201(c); *id.* § 541.203(b). The Court concludes that RBC has failed to meet its burden with respect to Capozzoli's FLSA claims, and therefore summary judgment is not appropriate.

**Cruz**

Plaintiffs argue that Cruz does not satisfy the second requirement under 29 C.F.R. § 541.200(a) because his primary duty "was selling financial products on behalf of RBC." (Pl. Cruz's Resp. to Def.'s Mot. for Summ. J. at 12, Docket No. 232.) They argue that Cruz's primary duties "were merely [those] of a transactional salesman whose

clients were sophisticated institutional investors not seeking financial advice or strategies from [Cruz]." (*Id.*) They further argue that any other duties that Cruz performed "were incidental to his sales." (*Id.* at 15.) With respect to the third requirement under 29 C.F.R. § 541.200(a), plaintiffs suggest that "it is . . . questionable whether [Cruz] exercised discretion in performing his job requirements as he was constrained to follow the NASD and FINRA standards." (*Id.* at 18 n.19 (citing 29 C.F.R. § 541.202(a).)

Cruz testified in his deposition that he spent "a large part" of his time working for RBC building relationships with existing clients. (Cruz Dep. at 161.) He spent "most of the day" on the phone with clients, and he had regular in-person meetings with Miami-based clients. (*Id.* at 103, 155-56.) Cruz testified that because his clients were sophisticated institutional clients, for most of them "there was not much recommendations to do." (*Id.* at 28.) If he "did any recommendations, it was very seldom" because his clients knew what they wanted. (*Id.* at 91.) He testified that "[t]hey would usually buy what they were looking for, what would fit their portfolio or what they were looking for." (*Id.* at 28.) He understood that "[t]he essence" of his job "was to sell bonds." (*Id.* at 131.) He was aware of each client's risk parameters and "what each client is looking for," and therefore, "[i]n that sense, it's pretty standard. I know what one client can buy, I know what the other client can buy, I know what's suitable for each one." (*Id.* at 54.)

As part of his job duties, Cruz traveled with Pazos and Roque to Venezuela and Columbia to meet with clients and potential clients. (*Id.* at 103-04.) He had a speaking role during these meetings, which involved discussions about the client's investment

portfolio and market trends. (*Id.* at 107.) Clients asked for Cruz's opinion about "what we thought the market was doing and what are people out there doing and what RBC thought." (*Id.*) Cruz testified that during these meetings he had to be careful about compliance issues because "each country has a set of rules of doing business." (*Id.* at 109.)

During his time at RBC, Cruz developed a business or marketing plan for himself. (*Id.* at 173.) The plan consisted of "[g]overnment accounts in Columbia, Venezuela, Chile and out of Miami[.]" (*Id.* at 173-74.) Cruz personally identified which larger institutions to call on as customers and potential customers. (*Id.* at 98.) Cruz testified that he did not have any noteworthy conversations of substance with his manager, and that he worked independently. (*Id.* at 140-41.) He testified that nobody at RBC told him what to say to clients. (*Id.* at 141.)

The Court finds that, viewing the facts in a light most favorable to Cruz, there is a genuine issue of material fact as to whether Cruz satisfies the second requirement for the administrative exemption. A reasonable trier of fact could conclude that Cruz's primary duty was to respond to client requests for particular investments and to sell financial products, rather than to serve as an adviser and consultant making recommendations to RBC's customers. *See* 29 C.F.R. § 541.201(c); *id.* § 541.203(b). The Court concludes that RBC has failed to meet its burden with respect to Cruz's FLSA claims, and therefore summary judgment is not appropriate.

The Court finds, however, that no reasonable juror could conclude that Cruz's primary duty did not include the exercise of discretion and independent judgment with

respect to matters of significance. *See id.* § 541.200(a)(3). The November 2006 Opinion Letter demonstrates that registered representatives, who must follow NASD and FINRA standards, may also satisfy the third requirement for the administrative exemption. Cruz's deposition testimony demonstrates that his exercise of discretion and independent judgment is "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *See id.* § 541.202(e). Cruz worked independently in developing his business plan, in identifying potential customers, and in offering his opinions to clients. There is no genuine factual dispute that Cruz satisfies the third requirement for the administrative exemption.

**David**

Plaintiffs argue that David does not satisfy the second requirement under 29 C.F.R. § 541.200(a) because his primary duty was selling financial products. (Pl. David's Resp. to Def.'s Mot. for Summ. J. at 12, Docket No. 225.) They argue that David's activities relating to FINRA standards were ancillary to his primary duty of sales. (*Id.* at 14.) They argue that "[c]ompliance activity only arose to the extent required by [David's] primary sales activities of prospecting new clients and recommending transactions." (*Id.* at 14-15.)

David had worked as a stockbroker for over forty years before he began working for RBC. He held several securities licenses, including Series 7, 8, 63, 65, and "[e]very license that has to be done." (David Dep. at 13, 88-94.) He was also a certified investment advisor. (*Id.* at 95.) At RBC, all of his clients were individuals, rather than

institutional clients. (*Id.* at 104.) He testified that he functioned independently at RBC and made all of his decisions for himself. (*Id.* at 152.)

David testified that the "main thing" he did, and the task that was most important and took up most of his time, was to give good advice to his clients after learning everything he could about them. (*Id.* at 146.) David testified that he was "trained to do the best – what is good for the clients," and that doing what was good for the client would sometimes affect his production because it could depress sales. (*Id.* at 43-44.) He spent approximately two hours each day doing research, and five or six hours each day talking to current clients about their investments or learning about their situation. (*Id.* at 64.) In talking to clients, he informed them about market changes and trends and he made sure they understood the advantages and disadvantages involved with certain investment choices. (*Id.* at 67.) He testified that he sometimes advised clients to leave their money where it was, even though that advice would not earn him a commission, because his priority was to give the right recommendation to the client. (*Id.* at 189.) David testified that he was familiar with hundreds of different investment vehicles and that he kept himself informed about markets, the economy, and other factors that might affect his recommendations to clients. (*Id.* at 34-35.)

The Court finds that there is a genuine fact issue regarding whether David is administratively exempt.[8] David's own testimony flatly contradicts plaintiffs' bald

---

[8] Plaintiffs do not dispute that David satisfies the third requirement. (*See* Pl. David's Resp. to Def.'s Mot. for Summ. J. at 12-24, Docket No. 225.) For the reasons stated with respect to Alvarez, the Court finds that David's compensation satisfies the first requirement.

assertion that "research, analysis and fact-gathering activity undertaken by David is . . . clearly subordinate to his primary duty of sales." (Pl. David's Resp. to Def.'s Mot. for Summ. J. at 15, Docket No. 225.) First, David's primary duty was to give advice and make recommendations to clients. To determine David's primary duty, the Court considers "the relative importance of the exempt duties as compared with other types of duties," "the amount of time [David] spent performing exempt work," David's "relative freedom from direct supervision," and the relationship between David's compensation and the wages paid to other employees for the nonexempt work that David performed. 29 C.F.R. § 541.700(a). David testified that his most important duty was to give advice and make recommendations to clients – duties that are exempt. *See Hein*, 511 F. Supp. 2d at 572 ("Plaintiff . . . acknowledged that . . . the most important thing he did was make appropriate recommendations to clients, even if he did not realize a sale as a result."). He testified that he spent most of his time engaged in this duty. He also testified that he worked independently and was free from supervision. Finally, there is no evidence to suggest that other employees received specific compensation for the part of David's work that was nonexempt: "[c]losing the sale." *See Hein*, 511 F. Supp. 2d at 573 (internal quotation marks omitted). All plaintiffs described the act of closing a sale as a relatively minor event that takes place in a matter of minutes. Viewing these factors as a whole, and viewing the evidence in a light most favorable to David, there is no genuine dispute that David's primary duty was to give advice and make recommendations to clients.

Nonetheless, there is a genuine dispute as to whether David's primary duty is "work directly related to the management or general business operations of" RBC or

RBC's customers, as defined in the regulations and other Department of Labor guidance. *See* 29 C.F.R. § 541.200(a)(2). His duty was to act as a financial adviser and consultant to RBC's clients and customers, and therefore his work seems to satisfy the second requirement. *See id.* § 541.201(c). His primary duty included "work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; [and] advising the customer regarding the advantages and disadvantages of different financial products[.]" *Id.* § 541.203(b); *see* 69 Fed. Reg. at 22146 ("[A] financial services employee whose primary duty is gathering and analyzing facts and providing consulting advice to assist customers in choosing among many complex financial products may be an exempt administrative employee."); November 2006 Opinion Letter at 5 (concluding that registered representatives whose "work includes collecting and analyzing a client's financial information, advising the client about the risks and advantages and disadvantages of various investment opportunities in light of the client's individual financial circumstances, and recommending to the client only those securities that are suitable for the client's particular financial status, objectives, risk tolerance, tax exposure, and other investment needs" satisfy the second requirement). All of David's clients, however, were individuals. The Department of Labor has stated that "[i]ndividuals acting in a purely personal capacity do not have 'management or general business operations' within the meaning of [the administrative] exemption." U.S. Dep't

of Labor, Wage & Hour Div., Administrator's Interpretation No. 2010-1 at 7 (Mar. 24, 2010).[9]  Based on the evidence in the record, the Court cannot determine, as a matter of law, whether David's clients had management or general business operations within the meaning of the administrative exemption.

Viewing the evidence in a light most favorable to David, there is a genuine dispute as to whether David's primary duty satisfies the second requirement for the administrative exemption.  The Court therefore denies RBC's motion for summary judgment on David's FLSA claims.

**Kennedy**

Plaintiffs argue that Kennedy does not satisfy the second requirement under 29 C.F.R. § 541.200(a) because he "testified that his primary duty was sales, and RBC's own job descriptions and recruiting materials corroborate this testimony."[10]  (Pl. Kennedy's Resp. to Def.'s Mot. for Summ. J. at 13, Docket No. 227.)  They argue that "Kennedy's compliance activity . . . . was an ancillary activity, not his primary duty."

---

[9] The Court has reviewed the March 24, 2010 Administrator's Interpretation and finds that in all other respects it does not undermine the conclusions of the November 2006 Opinion Letter.  The Administrator's Interpretation discusses the work of mortgage loan officers, who typically do not have ongoing relationships with clients, as individuals in the financial services industry often do.  Therefore, the nature of the sales activities and other work duties of mortgage loan officers differs from the sales activities and other work duties of securities brokers such as plaintiffs.  Moreover, although the Administrator's Interpretation expressly withdraws two other opinion letters, it does not withdraw or even reference the November 2006 Opinion Letter, which specifically addresses whether registered representatives in the financial services industry qualify for the administrative exemption.

[10] Plaintiffs do not dispute that Kennedy satisfies the third requirement.  (*See* Pl. Kennedy's Resp. to Def.'s Mot. for Summ. J. at 10-26, Docket No. 227.)

(*Id.* at 15.) According to plaintiffs, Kennedy engaged in compliance activity "only . . . to the extent required by his primary sales activities of prospecting new clients and recommending transactions." (*Id.* at 15-16.)

Kennedy testified in his deposition that he worked in the Private Client Group, primarily with individual clients and smaller corporate clients. (Kennedy Dep. at 128.) Kennedy testified that he spent approximately forty percent of his time trying to develop new clients. (*Id.* at 178-82.) He spent the remaining sixty percent of his time with existing clients and doing analysis and research regarding markets and investments. (*Id.* at 182.) Kennedy testified that investment planning was "[a]bsolutely" at the heart of his job as a financial consultant, and that investment planning involved "[a]nalyzing the current investment objectives of the client, time horizons, risk tolerance and determining what strategies are appropriate in the marketplace[.]" (*Id.* at 165-66.) He testified that it was "[a]bsolutely" his job as a financial consultant to stay on top of which investments were suitable for particular clients, and whether certain investments remained suitable for them. (*Id.* at 271-72.) He determined suitability "[b]ased upon [his] understanding of knowing [his] client, conversations with the client, [and] understanding their investment and financial objectives." (*Id.* at 272.) He learned about client objectives by "[t]alking to the client; understanding the business; understanding relative risks – whether it's high or low – the various types of investments; understanding diversification; understanding credit quality of underlying companies; U.S. Treasuries; guarantees; AAA-rated security on down to junk bonds[.]" (*Id.*) He testified that he acquired this knowledge "by doing the research, discussing it with the traders, [and] discussing it with our research

department." (*Id.* at 273.) He testified that there were "[t]housands" of different types of investments that he could recommend to a client, and that he decided which ones to recommend based on "analysis and research," as well has his judgment as to which investment was the right one for the client. (*Id.* at 293-94.) He testified that there were situations in which the client's current investment was the most suitable investment, and therefore he recommended that the client leave his or her money where it was." (*Id.* at 291.)

Whether Kennedy qualifies for the administrative exemption as a matter of law presents a close question. His testimony demonstrates that he engaged in many exempt activities, including providing advice and making recommendations to clients, and he agreed that investment planning was "[a]bsolutely" at the heart of his job. The record is unclear, however, as to the nature of Kennedy's duties during the sixty percent of the time he was interacting with current clients. His role may have been primarily taking orders from clients who knew which kinds of investments they wanted to make, as Capozzoli and Cruz testified, or it may have been primarily determining what was in the best interests of clients and providing them with advice based on those determinations, as David testified. Although Kennedy's testimony strongly suggests that his primary duty was similar to David's, the Court finds that there are disputed facts regarding some of the factors the Court must consider in determining Kennedy's primary duty. *See* 29 C.F.R. § 541.700(a). In particular, the parties dispute the relative importance of Kennedy's role as an advisor and counselor to clients, as opposed to his role as a seller of financial products in response to client requests. Kennedy had business and individual clients, but,

as with David, the Court cannot determine whether Kennedy's individual clients had management or general business operations within the meaning of the administrative exemption. It is also unclear how much time Kennedy spent performing exempt work. Based on the record before the Court, there are genuine issues of fact regarding whether Kennedy's "primary duty [was] selling financial products," or whether his duties primarily involved "collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; [and] advising the customer regarding the advantages and disadvantages of different financial products." *See id.* § 541.203(b). Viewing the facts in a light most favorable to Kennedy, the Court finds that a reasonable juror could conclude that Kennedy's primary duty was not the performance of work directly related to the management or general business operations of RBC or RBC's customers. *See id.* § 541.200(a)(2). The Court concludes that RBC has failed to meet its burden with respect to Kennedy's FLSA claims, and therefore summary judgment is not appropriate.

**Kuhlman**

Because the Court concludes in the following subsection that Kuhlman falls within the highly compensated employee exemption, the Court declines to address whether, in the alternative, Kuhlman would qualify for the administrative exemption under the FLSA.

### 6. Highly Compensated Employee Exemption (Subpart G)

RBC argues that Grattan, Kuhlman, Pazos, and Roque fall within the highly compensated employee exemption. Department of Labor regulations state that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* § 541.601(c). Therefore, "[a]n employee with total annual compensation of at least $100,000 is deemed exempt . . . if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an . . . administrative . . . employee[.]" *Id.* § 541.601(a). The regulations define the phrase "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." *Id.* § 541.701. The employee's total annual compensation "must include at least $455 per week paid on a salary or fee basis," but may also include "commissions, nondiscretionary bonuses and other nondiscretionary compensation." *Id.* § 541.601(b)(1).

The Court concludes that Grattan, Kuhlman, Pazos, and Roque satisfy the annual and weekly income requirements for the highly compensated employee exemption. Plaintiffs do not dispute that Grattan, Kuhlman, Pazos, and Roque received total annual

compensation of at least $100,000.[11]  (*See* Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 11-30, Docket No. 217; Pl. Kuhlman's Resp. to Def.'s Mot. for Summ. J. at 9-28, Docket No. 229; Pl. Pazos' Resp. to Def.'s Mot. for Summ. J. at 10-30, Docket No. 219; Pl. Roque's Resp. to Def.'s Mot. for Summ. J. at 9-28, Docket No. 221.)  They argue, however, that those employees did not receive at least $455 per week on a salary basis because that compensation was based on commissions.  For the reasons stated in Part I.B.5.a above and with respect to plaintiff Alvarez, the Court finds that RBC's compensation system satisfies the FLSA's salary basis requirement.[12]

The Court next addresses whether Grattan, Kuhlman, Pazos, and Roque normally and recurrently performed any one or more of the exempt duties of an administrative employee.[13]

---

[11] Plaintiffs assert, without any citation to the record, that "in one year (2006), [Kuhlman] did not receive total compensation in excess of $100,000[.]"  (Pl. Kuhlman's Resp. to Def.'s Mot. for Summ. J. at 27 n. 26, Docket No. 229.)  As RBC notes, however, Kuhlman worked for RBC for only nine months in 2006, and during that period he earned over $93,000.  (Mem. in Supp. of Def.'s Mot. for Summ. J. at 18, Docket No. 162.)  Pursuant to 29 C.F.R. § 541.601(b)(3), "[a]n employee who does not work a full year for the employer . . . may qualify for exemption under this section if the employee receives a pro rata portion of the minimum amount established in paragraph (a) of this section, based upon the number of weeks that the employee will be or has been employed."  The Court finds that there is no genuine factual dispute that Kuhlman satisfied the compensation requirements for the highly compensated employee exemption during all relevant time periods.

[12] Plaintiffs make several other arguments about the administrative exemption as it relates to the highly compensated employee exemption.  (*See, e.g.*, Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 11-30, Docket No. 217.)  The Court addresses those arguments in Part I.B.5.h above.

[13] RBC also argues that some of these employees customarily and regularly performed one or more of the exempt duties of a professional employee.  Because the Court finds that each of these plaintiffs customarily and regularly performed one or more of the exempt duties of an administrative employee, the Court declines to address this alternative basis for finding that they fall within the highly compensated employee exemption.

**Grattan**

Plaintiffs argue that Grattan's "primary duty is selling financial products such as fixed income securities," and therefore he "does not qualify for the administrative exemption, and is therefore not involved in the 'management or general business operations' of RBC." (Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 18, Docket No. 217.) They argue that "sales (and tasks incidental to and in conjunction with making those sales) are not activities that qualify as 'work directly related to management or business operations.'" (*Id.* at 19.) They state that Grattan's clients were "primarily highly sophisticated institutional investors who were not interested in 'advice,' but rather interested in good execution." (*Id.* at 23 n.20.) Any advice Grattan gave, plaintiffs argue, "was simply ancillary to the sale." (*Id.* at 24.)

As an initial matter, plaintiffs' "primary duty" analysis is not relevant to the Court's determination of whether Grattan (or one of the other three employees at issue[14]) qualifies for the highly compensated employee exemption. An employee would qualify for the exemption even if his or her primary duty was to perform nonexempt work, such as executing transactions, so long as the employee **also** "normally and recurrently" performed at least one of the exempt duties of an administrative employee. 29 C.F.R. § 541.601(a); *id.* § 541.701. Therefore, even if the employee's exempt duties are ancillary to nonexempt duties, and even if the employee spends most of his or her work

_____

[14] Plaintiffs make this "primary duty" argument with respect to Grattan, Kuhlman, Pazos, and Roque.

time performing nonexempt duties, the employee may qualify for the exemption if he or she customarily and regularly performs at least one exempt duty. *Cf. Martin*, 940 F.2d at 904 ("Cooper's inside salespersons do not 'service' Cooper's business **enough** to justify a finding that they are administrative employees within the meaning of 29 C.F.R. § 541.205(a) & (b). Even though inside salespersons may sometimes 'negotiate', 'represent the company' and 'purchase' on Cooper's behalf when customers request products not already in Cooper's stock-in-inventory, these are **not their primary duties**." (emphases added).)

Grattan worked in the Institutional Sales Department in the Fixed Income Group. (Wells Decl. Ex. 58, Docket No. 231.) He has an undergraduate degree in economics and an MBA. (Grattan Dep. at 88.) He has several licenses for working in the financial services industry, including "a Series 63, a Series 65, Series 3, [and] Series 7." (*Id.* at 21-22.) Grattan testified in his deposition that as a registered representative he was subject to, and tried to comply with, the Know Your Customer rules, which, according to Grattan, require him to "ensure that the services and advice provided to [his] client are suitable for their investment needs[.]" (*Id.* at 23.) Grattan testified that he engaged in at least six of the seven critical functions tested in the Series 7 examination. (*Id.* at 78.) With respect to the third function, which involves "[p]rovid[ing] customers and prospective customers with information on investments and makes suitable recommendations," he explained that "[i]n dealing with clients that were institutional or highly sophisticated, [he] wasn't making recommendations." (*Id.*) He testified that most of his sophisticated institutional clients "could care less about [Grattan] personally. They

wanted quality execution, seamless delivery, good counter-party risk, and that's all." (*Id.* at 72.) He testified that he did not provide these clients with information on investments. (*Id.*) Of the remaining tasks, however, Grattan testified that he spent an equal portion of time on each one. (*Id.* at 206-07.) He also testified that he regularly performed the critical functions. (*Id.* at 207.)

Grattan agreed "wholeheartedly" that FINRA rules required him to determine the suitability of each specific transaction, only "on a case-by-case basis, taking into consideration all the facts and circumstances of a particular member/customer relationship assessed in the context of a particular transaction." (*Id.* at 57-58.) He testified that, "on every order," he had to use due diligence to "ascertain whether or not that security . . . was . . . acceptable or not." (*Id.* at 66.) He testified that it was difficult to make this determination because clients were "not going to share that information [about their existing portfolios] with [Grattan]. So it's difficult. But in general, you know those types of securities which are allowable under their investment policy or the general type of client they are, the fiduciary relationship that they have." (*Id.*) Grattan also testified that he "certainly" spent at least "an hour a day" and two to three hours on weekends "on research, whether it's researching the markets, [or] researching new products," because he "had to be cognizant of what's going on in the marketplace." (*Id.* at 167.)

Viewing the facts in a light most favorable to Grattan, no reasonable juror could conclude that Grattan did not customarily and regularly perform one or more of the exempt duties of an administrative employee. He testified that he "regularly" performed

the critical functions, and spent an equal amount of time on each. One of the critical functions is to "[e]valuate customers in terms of financial needs, current holdings, and available investment capital, and [to] help[] them identify their investment objectives." Those duties are "directly related to the management or general business operations of" RBC's customers, and therefore are administrative duties. *See* 29 C.F.R. § 541.200(a)(2). Grattan also testified that on every order he engaged in due diligence to determine whether the investment was acceptable in light of the particular customer's existing portfolio and investment policy. That duty is also an administrative duty. There is no genuine dispute that Grattan regularly performed these exempt duties, and therefore the Court grants RBC's motion for summary judgment on Grattan's FLSA claims.

**Kuhlman**

Plaintiffs argue that Kuhlman's "job duties were geared to the sale of third parties' financial products to RBC's clients; activities that courts have found are not exempt under the FLSA." (Pl. Kuhlman's Resp. to Def.'s Mot. for Summ. J. at 27, Docket No. 229.) Therefore, plaintiffs argue, Kuhlman "did not 'regularly or customarily' engage in any exempt administrative . . . activities." (*Id.*)

Kuhlman testified in his deposition that he spent "most of the day" on the following activities: talking to clients, looking for inventory, checking the markets, watching certain stocks in client portfolios, reviewing client accounts, learning about client circumstances, and learning about investment products and markets so that he could make good recommendations to clients. (Kuhlman Dep. at 289-90.) He spent no

more than one hour each day placing orders.  (*Id.* at 291.)  He testified that it was his job to match up a client's needs with the available and suitable investment products.  (*Id.* at 258.)  Therefore, he testified, he engaged in conversations with clients to learn all of the pertinent facts, and he collected information about their risk tolerance, time horizons, and any immediate needs for cash.  (*Id.* at 276.)  He understood his obligation under FINRA's Know Your Client rule to show clients "the correct and suitable investment . . . and better . . . help them."  (*Id.* at 257.)  He testified that when he made investment recommendations to clients, he discussed the advantages and disadvantages of the particular recommendation.  (*Id.* at 295.)

Viewing the evidence in a light most favorable to Kuhlman, no reasonable juror could conclude that he did not regularly and customarily perform exempt administrative duties.  Although Kuhlman regularly performed nonexempt duties such as placing orders, on a daily basis he gathered information about clients and investment opportunities so that he could make suitable investment recommendations.  Those duties are "directly related to the management or general business operations of" RBC's customers, and therefore are exempt administrative duties.  *See* 29 C.F.R. § 541.200(a)(2); *see also id.* § 541.203(b) ("Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the

employer's financial products."). There is no genuine dispute that Kuhlman regularly performed these exempt duties, and therefore the Court grants RBC's motion for summary judgment on Kuhlman's FLSA claims.

**Pazos**

Plaintiffs argue that Pazos' "primary duty [wa]s selling financial products such as fixed income securities," and that because he "does not qualify for the administrative exemption," he "is therefore not involved in the 'management or general business operations' of RBC" and cannot qualify for the highly compensated employee exemption. (Pl. Pazos' Resp. to Def.'s Mot. for Summ. J. at 19, Docket No. 219.) They argue that any advice that Pazos provided to his highly sophisticated institutional clients "was simply ancillary to the sale." (*Id.* at 24.)

Pazos worked as an Institutional Salesperson in the Institutional Sales Department of RBC's Fixed Income Group. (Wells Decl. Ex. 68, Docket No. 231.) RBC recruited Pazos and the other Florida plaintiffs to expand RBC's presence in emerging markets. (Pazos Dep. at 98-99.) Pazos testified in his deposition that he and the other Florida plaintiffs came to RBC as a group, and Pazos felt that it was important to come as a group "[b]ecause that was our business that we had built over decades, and . . . there was a value to that package that could not be extrapolated by any one individual." (*Id.* at 101.) He testified that he brought expertise and "experience in dealing in emerging markets securities . . . [and] knowledge about the regions, how to travel, . . . and also knowledge about the issuance of those countries maybe." (*Id.* at 99.) Nearly all of

Pazos' fixed income securities customers "were known entities, institutional accounts, either banks, most private banking groups, funds, that had a level of expertise on their side that where they would come in and agree on something that they had done their due diligence on, and they felt was suitable, and we felt that they had the financial wherewithal also to buy the security." (*Id.* at 18.)

Pazos testified that he "[c]ontinuously" performed all seven critical functions. (*Id.* at 235.) He explained that with respect to the third function, which involves providing customers with information on investments and making suitable recommendations, and the seventh function, which involves monitoring the customer's portfolio and making recommendations consistent with the customer's objectives and changes in economic conditions, he was "less if not very passive or less active . . . [than] the other ones we were more involved in." (*Id.* at 78, 87.) With respect to the third function, however, he testified that he did describe the characteristics, risks, and rewards of various securities to his customers and prospective customers. (*Id.* at 87.)

Pazos was also part of RBC's "Miami Team," which participated in meetings with RBC management about components of a business plan to develop the new market for RBC in Latin America. (*Id.* at 163-64, 197-98.) Pazos testified that developing the Latin American market for RBC was "a massive undertaking that requires time and patience in order to build solid relationships, credibility, and compliance." (*Id.* at 198.) The Miami Team worked with management to develop production targets and to identify products and geographic areas for bringing in new accounts, and also to come up with strategies to cross-market with other divisions of RBC. (*Id.* at 164, 197.) During an RBC meeting in

Toronto, the Miami Team presented the business plan to a group of sixty people from various divisions of RBC. (*Id.* at 197.)

Viewing the facts in a light most favorable to Pazos, no reasonable juror could conclude that Pazos did not customarily and regularly perform one or more of the exempt duties of an administrative employee. He testified that he "continuously" performed each of the seven critical functions, and identified functions one, two, and four through six as the functions that he was "more involved in." Function five involves "[e]xplain[ing] [to clients] the organization, participants, and functions of various securities markets and the principal factors that affect them." (Pazos Dep. Ex. 3 at 3.) Function two involves "[e]valuat[ing] customers in terms of financial needs, current holdings, and available investment capital, and help[ing] them identify their investment objectives." (*Id.*) These duties are "directly related to the management or general business operations of" RBC's customers, and therefore are administrative duties. *See* 29 C.F.R. § 541.200(a)(2). Pazos also had duties related to the development of the Miami Team's business plan for RBC's "massive undertaking" to establish a presence in Latin America. Those duties are directly related to the management and general business operations of RBC itself. There is no genuine dispute that Pazos regularly performed these exempt administrative duties, and therefore the Court grants RBC's motion for summary judgment on Pazos' FLSA claims.

**Roque**

Plaintiffs argue that "sales (and tasks incidental to and in conjunction with making those sales) are not activities that qualify as 'work directly related to management or business operations.'" (Pl. Roque's Resp. to Def.'s Mot. for Summ. J. at 18, Docket No. 221.) They further argue that Roque "was exclusively engaged in the sale of fixed income securities to large sophisticated institutional investors who knew exactly what fixed income securities they wanted to buy or sell. Therefore, [Roque] merely executed the trade for these clients." (*Id.* at 22.)

Roque worked as an Institutional Salesperson in the Institutional Sales Department of RBC's Fixed Income Group. (Wells Decl. Ex. 82, Docket No. 231.) Roque testified in his deposition that when RBC hired Roque and the other Florida plaintiffs, they considered themselves experts in Latin America. (Roque Dep. at 82.) Roque testified that he was aware of the particular investment needs of Latin American investors, and that he was "aware of what it is that they are going to be able to have to maximize, and . . . [he knew] local regulations, what they can and cannot get into." (*Id.* at 83.) Roque testified that RBC hired him to help create an organized sales effort in Latin America. (*Id.* at 151.) Roque agreed that it was a massive undertaking to establish RBC in Latin America, requiring "time and patience in order to build solid relationships, credibility, and compliance." (*Id.* at 149.)

Roque testified that in dealing with clients he was "not out making recommendations" about whether a particular security was suitable. (*Id.* at 33.) He testified that he understood that he had suitability obligations when dealing with his

clients, and that he made those suitability determinations "at the onset of the relationship." (*Id.* at 33, 39.)

Roque testified that he gets "a bit of an edge with the competition" by "traveling" and "building a relationship" with clients. (*Id.* at 19.) He testified that he builds a successful relationship by "[p]utting in the time, making sure that [he's] making phone calls, [he's] flying and visiting, and [he tries] to put the best face of the institution forward in terms of, you know, emphasize the bonds, that they have capabilities, and they can give you an advantage with." (*Id.* at 20.)

Roque testified that he spent "[t]he whole day" performing elements of the seven critical functions. (*Id.* at 71.) He testified that the following sub-categories described some of the activities he did "the whole day": "[o]btain[ing] a current financial and investment profile of the customer," "[e]nsur[ing] that the customer is provided with pertinent information describing a particular investment," "[i]nvestigat[ing] alternative investments for the customer," "[c]onsider[ing] the tax implications for a customer of particular investments," "[e]xplain[ing] the purpose and workings of the primary marketplace and how new issues of various types of securities are sold," "[o]btain[ing] economic news and assess[ing] how this may affect the markets," "[e]xplain[ing] how news about an issuer's financial outlook may affect the performance of that issuer's securities," and "[k]eep[ing] the customer informed about the customer's investments." (*See id.*) He explained, for example, that he investigated alternative investments for customers and made suggestions based on the customer's liquidity needs and the characteristics of particular investments. (*Id.* at 72.)

Viewing the facts in a light most favorable to Roque, no reasonable trier of fact could conclude that he did not regularly perform one or more of the exempt duties of an administrative employee. He testified that he spent time developing relationships with clients and establishing credibility in Latin American markets. Those duties are "directly related to the . . . general business operations of" RBC, which had hired the Miami Team to help it develop a foothold in Latin America. Roque also testified that he spent the whole day performing a variety of duties, at least some of which are administratively exempt. For example, obtaining customer and investment information and explaining particular securities and market news to clients are duties that are "directly related to the management or general business operations of" RBC's customers, and therefore are administrative duties. *See* 29 C.F.R. § 541.200(a)(2). There is no genuine dispute that Roque regularly performed these exempt administrative duties, and therefore the Court grants RBC's motion for summary judgment on Roque's FLSA claims.

### 7. Summary of FLSA Claims

In summary, for Counts 1 and 2, the Court grants RBC's motion for summary judgment as to Blumberg-Markus on the basis that her FLSA claims are time-barred, and grants RBC's motion as to Grattan, Kuhlman, Pazos, and Roque on the basis that they fall under the highly compensated employee exemption. The Court denies RBC's motion for summary judgment as to the FLSA claims of Alvarez, Capozzoli, Cruz, David, and Kennedy.

## C.    ERISA Claim (Count 15)

In addition to the FLSA minimum wage and overtime claims addressed in Part I.B above and the state law claims addressed in Parts I.D through F below, the complaint alleges that RBC violated ERISA with respect to its Wealth Accumulation Plan ("WAP").  The complaint alleges that RBC

> induced and/or required [certain RBC employees] to contribute to a deferred compensation requirement income plan, which plan [RBC] depicted to be a non-ERISA plan and which provides for payroll deductions as an investment in the general assets of the employer and which further provided that the [employees] forfeited all income within the plan upon termination of employment, including employee contributions.

(Second Consolidated Am. Compl. ¶ 164, Docket No. 77.)   The complaint "seek[s] restitution for all amounts contributed by employees or on employees' behalf within the proper time period into the deferred compensation retirement plan."   (*Id.* ¶ 170.) Kennedy is the only remaining plaintiff for whom the complaint alleges this ERISA claim.  (*See id.* ¶ 6.)

According to a declaration provided by Gabriela Sikich, an RBC Defined Contribution Plan Manager, "[o]nly a small percentage of the employees of [RBC's] WAP-participating entities are eligible to participate in the WAP."  (Sikich Decl. ¶¶ 2, 8, Docket No. 187.)  With respect to Financial Consultants such as Kennedy, "eligibility in WAP plan years 2003 through 2007 was limited to those [Financial Consultants] whose previous fiscal year production was at least $300,000."  (*Id.* ¶ 7.)  Sikich states that "Kennedy never met the WAP's eligibility requirements, and thus, he never participated in the WAP."  (*Id.* ¶ 9.)

Kennedy testified in his deposition that he did not "recall exactly what [his] participation was in the [WAP]." (Kennedy Dep. at 47-48.) He did not "recall if [he] made a personal voluntary contribution [to the WAP]." (*Id.* at 198.) He did not know of any pay stubs that showed that he had made a contribution to the WAP. (*Id.* at 267.) He was under the impression that an employee would be eligible for the WAP if the employee fell "under the structure of working for and towards clients in generating commissions in certain levels of production," and if the employee was "in a team environment [consisting of] two brokers and a sales assistant." (*Id.* at 61-62.)

RBC argues that summary judgment on Count 15 is appropriate because Kennedy lacks standing to bring his ERISA claims. (Mem. in Supp. of Mot. for Summ. J. at 25-26, Docket No. 185.) The Court agrees.

First, there is no genuine issue of fact regarding Kennedy's ineligibility for the WAP. Kennedy offers no response to Sikich's declaration, under penalty of perjury, that Kennedy was at all times ineligible for the WAP. (*See* Pl. Kennedy's Resp. to Def.'s Mot. for Summ. J. at 35-41, Docket No. 227.) Moreover, Kennedy's testimony is consistent with Sikich's declaration. Kennedy could not recall whether he participated in the WAP because he did not participate. He misunderstood the WAP's eligibility requirements, which he did not meet.

Second, because Kennedy was never eligible for the WAP, he lacks constitutional standing to challenge the legality of the plan. The injury alleged in the complaint does not pertain to Kennedy. The complaint does not allege that RBC wrongfully denied Kennedy participation in the WAP. It alleges that RBC "induced and/or required"

employees to contribute to the WAP, and then caused those employees to "forfeit[] all income within the [WAP] upon termination of employment." (Second Consolidated Am. Compl. ¶ 164, Docket No. 77.) Kennedy did not suffer these alleged injuries, and he is not entitled to the "restitution" that the complaint requests. (*See id.* ¶ 170.) He has therefore failed to satisfy "the irreducible constitutional minimum of standing." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 & n.1 (1992).

Plaintiffs' sole response to RBC's standing argument is that Kennedy "should be in the plan, and therefore has standing to sue." (Pl. Kennedy's Resp. to Def.'s Mot. for Summ. J. at 41, Docket No. 227.) Even if the Court were to ignore Sikich's uncontroverted declaration and assume that Kennedy should have been in the WAP, and even if the Court could somehow reconcile the allegation in the complaint that employees were "induced and/or required" to participate in the WAP with Kennedy's eleventh-hour argument that RBC wrongfully denied him the opportunity to participate in the WAP, the fact remains that Kennedy was not in the WAP. He therefore did not suffer any of the injuries alleged in the complaint. The Court therefore grants RBC's motion for summary judgment on Count 15.

### D.      Claims Under California Law (Counts 3 Through 11)

The complaint raises nine causes of action under California law on behalf of the California plaintiffs. The Court addresses each count in turn.

**Counts 3 and 4: Overtime and Minimum Wage**

Count 3 alleges that RBC failed to pay overtime, in violation of California Labor Code § 1194 and applicable state regulations. (Second Consolidated Am. Compl. ¶¶ 94-103, Docket No. 77.) The complaint further alleges that RBC "committed an act of unfair competition by not paying the required overtime pay." (*Id.* ¶ 101.) Count 4 alleges that RBC failed to pay the California minimum wage for each hour worked, in violation of California Labor Code § 1194 and applicable state regulations. (Second Consolidated Am. Compl. ¶¶ 105-07, Docket No. 77.)

California's overtime and minimum wage laws are similar to the FLSA in that they recognize an exemption for administrative employees. The parties agree that there are two substantive differences between the FLSA and the parallel California laws. First, under California law, the salary basis requirement is two times the state minimum wage, based on a forty-hour workweek. Cal. Lab. Code § 515(a), (c). (*See* Pl. Blumberg-Markus' Resp. to Def.'s Mot. for Summ. J. at 23, 25, Docket No. 223; Mem. in Supp. of Def.'s Mot. for Summ. J. at 17, Docket No. 152.) Second, under California law, an employee is "primarily" engaged in job duties if the employee spends more than half of her work time on those duties. Cal. Lab. Code § 515(e). (*See* Pl. Blumberg-Markus' Resp. to Def.'s Mot. for Summ. J. at 12, Docket No. 223; Mem. in Supp. of Def.'s Mot. for Summ. J. at 16-17, Docket No. 152.) A third distinction – one that the parties do not address directly – is that there is a three-year statute of limitations for violations of California's wage and hour laws, but California law does not require plaintiffs to file a notice of consent in order to commence the cause of action. *See Pellegrino v. Robert*

*Half Int'l, Inc.*, No. G040762, --- Cal. Rptr. 3d ---, 2010 WL 336687, at *5 (Cal. Ct. App. Jan. 28, 2010); *see also* Cal. Civ. Proc. Code § 338(a).

Blumberg-Markus

As discussed above, Blumberg-Markus's FLSA claims are time-barred. Her overtime and minimum wage claims under California law are similarly time-barred, because she first filed suit in 2007, more than three years after she left RBC in December 2002. (*See* Reply in Supp. of Mot. for Summ. J. at 2, Docket No. 254; *see also* Consolidated Am. Compl., Docket No. 43 (naming Blumberg-Markus as a plaintiff for the first time in this action).) The Court therefore grants RBC's motion to dismiss Counts 3 and 4 as to Blumberg-Markus.

David

The two substantive differences between the FLSA and California's minimum wage and overtime laws do not alter the Court's general conclusion that RBC is not entitled to summary judgment as to David. (*See* Pl. David's Resp. to Def.'s Mot. for Summ. J. at 9 n.9, Docket No. 225 ("[T]he California administrative exemption is construed in the same manner as the administrative exemption under the federal Fair Labor Standards Act." (internal quotation marks omitted).) First, after September 1, 2004, RBC guaranteed David compensation of $2,340 per month, in compliance with

California's salary basis requirement.[15]  (*See* Iverson Decl. ¶ 11, Docket No. 167.) Second, there is a genuine issue of fact regarding whether David spent more than half his work time on administratively exempt duties, and therefore, under California law, whether he was "primarily" engaged in such job duties.  *See* Cal. Lab. Code § 515(e). The Court therefore denies RBC's partial motion to dismiss Counts 3 and 4 as to David.

Kennedy

Because the Court finds that there is a genuine issue of material fact as to Kennedy's FLSA claims, the Court also finds that there is a genuine issue of material fact as to his claims for overtime and minimum wage violations under California law.[16] Under California law, there are genuine issues of material fact as to whether Kennedy was "primarily engaged in duties that meet the test of the [administrative] exemption," and as to whether at all relevant times he received compensation equivalent to at least two times the state minimum wage.  *See* Cal. Lab. Code § 515(a).  The Court finds, however, that there is no genuine factual dispute that Kennedy received the minimum salary basis compensation under California law at all relevant times after September 1, 2004.  (*See* Iverson Decl. ¶ 11, Docket No. 167; Iverson Supp. Decl. ¶ 4, Docket No. 257.)

---

[15] RBC did not move for summary judgment as to David's claim on Counts 3 and 4 to the extent it predates August 1, 2004.  (Reply in Supp. of Mot. for Summ. J. at 10, Docket No. 255.)

[16] "RBC has not moved for summary judgment on Kennedy's claims to the extent any predate August 1, 2004."  (Reply in Supp. of Mot. for Summ. J. at 9, Docket No. 251.)

Kuhlman

Plaintiffs do not argue that there are any substantive differences between the FLSA highly compensated employee exemption and the equivalent exemption under California law. (*See* Pl. Kuhlman's Resp. to Def.'s Mot. for Summ. J. at 26-28, Docket No. 229.) The only arguable distinction is the higher salary basis requirement under California law.

RBC argues that even prior to September 1, 2004, when RBC began ensuring that securities brokers working in California received double the California minimum wage, Kuhlman received guaranteed compensation of $2,560 per month in loan forgiveness, which was treated as taxable income. (*See* Reply in Supp. of Mot. for Summ. J. at 10, Docket No. 253.) Therefore, RBC argues, Kuhlman's compensation satisfied California's salary basis test at all times. (*Id.*) Plaintiffs offer no response to this argument, and therefore the Court concludes that there is no genuine issue of fact that Kuhlman's compensation satisfied California's salary basis requirement at all relevant times.

As RBC concedes, however, the highly compensated employee exemption went into effect on August 23, 2004. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 18, Docket No. 162.) Kuhlman filed suit on March 9, 2007, and therefore under California's three-year statute of limitations, the highly compensated employee exemption was not available for several months within the statutory period. The Court therefore must determine whether RBC is entitled to summary judgment based on California's administrative exemption that was in effect prior to August 23, 2004.

As discussed in greater detail in Part I.B.6, Kuhlman spent no more than one hour each day placing orders, and spent "about most of the day" talking with clients, reviewing client accounts, learning about client needs, checking the markets, and learning about investment products. (Kuhlman Dep. at 289-91.) The purpose of these activities was to make good recommendations to clients. (*Id.* at 289-90.) He agreed that it was his job as a financial consultant to match up the client's needs with the available and suitable investment products. (*Id.* at 258.)

No reasonable juror could conclude that Kuhlman spent less than fifty percent of his time at work engaged in exempt administrative duties. *See* Cal. Lab. Code § 515(a). Plaintiffs argue that Kuhlman's primary duty was to execute sales, and that all of his other duties were "subordinate to" his duty of sales, but under California law, the critical question is how Kuhlman apportioned his work day. He testified that he spent only one hour, at most, placing orders. The remainder of the day he spent engaged in exempt activities similar to those of "customers' brokers in stock exchange firms." *See* 29 C.F.R. § 541.205(c)(5) (2003); *see also id.* § 541.205(d) (2003) (listing "financial consultants" as a "[t]ypical instance[]" of bona fide administrative employees performing "important functions as advisers and consultants but [who] are employed by a concern engaged in furnishing such services for a fee"). The Court therefore grants RBC's motion for summary judgment on Counts 3 and 4 as to Kuhlman.

**Count 5: Offsets**

Count 5 alleges that RBC made unlawful deductions from employees' wages, in violation of California Labor Code §§ 221, 400-10, and 2802 and applicable state regulations. (Second Consolidated Am. Compl. ¶¶ 109-15, Docket No. 77.) The complaint alleges that RBC violated state law by "inappropriately requir[ing] [employees] to bear all losses sustained from 'reversed' trades in which [they] were involved." (*Id.* ¶ 111.) It further alleges that the "deductions were not the result of dishonest, willful or grossly negligent acts by those employees, but instead, were ordinary costs of doing business." (*Id.* ¶ 112.) Therefore, the complaint alleges, RBC unlawfully made deductions from employees' "wages for the purpose of shifting the employer's ordinary cost of doing business to the employee." (*Id.* ¶ 109.)

Section 221 of the California Labor Code states that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Cal. Lab. Code § 221. "Wages" include commissions. *Id.* § 200. The purpose of § 221 is "to prevent employers from utilizing secret deductions or kickbacks to pay employees less than their stated wages." *Koehl v. Verio, Inc.*, 48 Cal. Rptr. 3d 749, 767 (Cal. Ct. App. 2006) (internal quotation marks omitted).

The Court finds that RBC is not entitled to summary judgment on Count 5 because RBC's policy of deducting the full cost of a trading error from an employee's commissions, rather than simply cancelling the employee's anticipated commission, could violate § 221. California courts have concluded that there is no violation of § 221 where, for example, a store has a practice of recovering commissions on returned items,

"because those chargebacks were specifically tied to the sales in which the associate had been involved and for which the associate had received a direct benefit in the form of a commission." *Id.* at 766. California courts recognize that "contractual terms must be met before an employee is entitled to a commission." *Steinhebel v. L.A. Times Commc'ns, LLC*, 24 Cal. Rptr. 3d 351, 356 (Cal. Ct. App. 2005). If the commission is predicated on certain conditions, such as an error-free trade, then the employee is not entitled to that commission until those conditions are satisfied. If the conditions are not satisfied, the employee never receives the commission, and therefore the employer cannot "collect or receive" it "from an employee" in violation of § 221.

Plaintiffs note that RBC's policy makes "the employee . . . liable for the entire cost of the trading error, i.e. the change in stock price, rather than just a reversal of commission." (Pl. Blumberg-Markus' Resp. to Def.'s Mot. for Summ. J. at 29, Docket No. 223; *see* Mem. in Supp. of Def.'s Mot. for Summ. J. at 20, Docket No. 152 (conceding that under RBC's policy, an employee is "responsible . . . for losses due to a reversed trade caused by her trading errors").) In *Koehl v. Verio, Inc.*, the California Court of Appeal approved an employer's system of making forward-looking deductions from "subsequently earned commissions," where the employer "never [made deductions] from a sales associate's base pay." 48 Cal. Rptr. 3d at 758. In *Koehl*, however, the salesperson had already received the commission, and therefore, the only way for the employer to recoup the unearned commission was to deduct it from future commissions. There is no indication in *Koehl* that the employer also used chargebacks to recover its

losses over and above the unearned commission.[17]  As plaintiffs note, RBC's policy goes beyond simply eliminating a commission for a failed or erroneous transaction.

The California Division of Labor Standards has interpreted § 221 to mean that "the employer must bear" any "shortages and other losses occurring without any fault on the part of the employee or merely as a result of simple negligence . . . as an expense of doing business."  Cal. Div. of Labor Standards Enforcement, 2002 Update of the DLSE Enforcement Policies and Interpretations Manual (Revised) § 11.2.3 (Feb. 2009).[18]  An employer may, however, "deduct for losses suffered as a result of a dishonest or willful act or through the gross negligence of the employee."  *Id.* § 11.2.4.

The Court finds that summary judgment is not appropriate as to Count 5 because there is insufficient evidence in the record to determine whether RBC ever impermissibly deducted any transaction losses from any of the California plaintiffs' commissions.  First, the record does not show whether RBC ever made any deductions for transaction losses from plaintiffs' commissions.  Second, to determine whether RBC was entitled to deduct not only the unearned commission, but also the loss incurred from the erroneous transaction, the Court must determine, for example, whether the loss occurred as a result of the employee's gross negligence or as a result of the employee's "simple negligence."

---

[17] Similarly, the pay plan described in the opinion letter that RBC cites calculated a loan officer's commission as a "share[] [of] the 'gain' or 'loss' on the sale of the loan."  Cal. Div. of Labor Standards Enforcement, Op. Letter 1993.02.22 at 1, *available at* http://www.dir.ca.gov/dlse/OpinionLetters-byDate.htm.  RBC's policy does more than simply retract an unearned commission.

[18] The manual is available at http://www.dir.ca.gov/dlse/dlsemanual/dlse_enfcmanual.pdf.

This is a highly individualized fact issue that the Court cannot resolve on summary judgment. Therefore, the Court denies RBC's motion for summary judgment on Count 5 as to all California plaintiffs.

## Count 6: Reimbursement for Necessary Expenditures

Count 6 alleges that RBC failed to reimburse its employees for all necessary expenditures incurred by the employees in direct consequence of the discharge of their duties, in violation of California Labor Code § 2802. (Second Consolidated Am. Compl. ¶¶ 117-19, Docket No. 77.)

Section 2802 of the California Labor Code requires employers to reimburse employees "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Lab. Code § 2802. "In calculating the reimbursement amount due under section 2802, the employer may consider not only the actual expenses that the employee incurred, but also whether each of those expenses was 'necessary,' which in turn depends on the reasonableness of the employee's choices." *Gattuso v. Harte-Hanks Shoppers, Inc.*, 169 P.3d 889, 897 (Cal. 2007).

### Blumberg-Markus

RBC argues that it never required Blumberg-Markus to pay out-of-pocket for any necessary expenses, and therefore her claim alleging RBC failed to reimburse her must

fail.  (Def.'s Mot. for Summ. J. at 2, Docket No. 150.)  Blumberg-Markus responds[19] that

RBC violated § 2802 by failing to reimburse her for certain necessary out-of-pocket

expenses, including expenses for domestic and international postage, overnight delivery,

travel expenses, client meals, parking, stationery, business cards, and payments to office

assistants.  (Blumberg-Markus Dep. at 27-29, 44-45, 50, 216-19, 221, 223-25, 229-31.)

Even though she could not identify any expenses "that RBC told [her] to incur that

[RBC] did not reimburse [her] for," she testified that she did incur expenses that she

thought were necessary for her to perform her job and for which RBC would not

reimburse her.  (*Id.* at 224-26.)  She testified, for example, that she thought that her travel

for business was necessary for her to perform her job.  (*Id.* at 226.)  The Court cannot

determine, based on the record before the Court, whether Blumberg-Markus's

unreimbursed expenses were reasonable and therefore necessary under California law.

*See Grissom v. Vons Cos.*, 1 Cal. App. 4th 52, 58 (Cal. Ct. App. 1991) ("Necessity is by

nature a question of fact. . . . Accordingly, ascertaining what was a necessary expenditure

will require an inquiry into what was reasonable under the circumstances.").

Accordingly, summary judgment is not appropriate.

David

RBC argues that it provided David with everything he needed to do his job, and

that RBC did not require David to make any additional purchases.  (Mem. in Supp. of

---

[19]  Blumberg-Markus also argues that RBC's "trading error policy violates § 2802," because it makes the employee liable for the entire cost of the trading error.  A trading error, however, is not a "necessary" expenditure or loss.

Def.'s Mot. for Summ. J. at 25-26, Docket No. 157.) Therefore, RBC argues, David's purchases were not "necessary" under § 2802. (*Id.* at 26.) David testified in his deposition that he subscribed to a variety of periodicals to assist with his work duties, including the Wall Street Journal, Investment Business Daily, Forbes, Fortune, and Worth. (David Dep. at 35-37, 167.) He also subscribed to the services of a research firm called "Wall Street." (*Id.* at 166.) The Court cannot determine, based on the record before the Court, whether David's unreimbursed expenses for these items were reasonable and therefore necessary under California law. Accordingly, summary judgment is not appropriate.

Kennedy

Kennedy testified in his deposition that he could not "think of any" things that he needed to do his job as a financial consultant that RBC did not provide to him. (Kennedy Dep. at 275.) Plaintiffs assert, without citation to the record, that Kennedy "incurred out-of-pocket expenses for items related to the discharge of his duties." (Pl. Kennedy's Resp. to Def.'s Mot. for Summ. J. at 32-33, Docket No. 227.) Based on Kennedy's own uncontroverted testimony, no reasonable juror could conclude that RBC failed to reimburse Kennedy for any necessary expenditures he incurred, because RBC provided Kennedy with all of the tools he needed. Therefore, the Court grants RBC's motion for summary judgment on Count 6 as to Kennedy.

<u>Kuhlman</u>

Kuhlman testified that he agreed to pay his administrative assistant $150 per month in addition to the salary that RBC paid her. (Kuhlman Dep. at 237-39.) Kuhlman could not recall whether he ever discussed with his supervisor the decision to make these payments or whether his supervisor expressed any opinion about whether Kuhlman should pay her. (*Id.* at 317-18.)

The parties do not dispute that Kuhlman needed an administrative assistant or that RBC provided Kuhlman with an administrative assistant and provided her with a salary. The Court finds, however, that the additional compensation Kuhlman paid his assistant over and above what she received from RBC is not an expenditure that Kuhlman incurred "in direct consequence of the discharge of his . . . duties." Cal. Lab. Code § 2802. At most, it is an expense only indirectly related to Kuhlman's discharge of his own duties. Plaintiffs have not come forward with any evidence to suggest that this bonus was an expense for which RBC was obligated to reimburse Kuhlman under § 2802.

In summary, the Court denies RBC's motion for summary judgment on Count 6 as to Blumberg-Markus and David, and grants RBC's motion as to Kennedy and Kuhlman.

**Count 7: Waiting Time Penalties**

Count 7 alleges that RBC willfully and intentionally failed to pay employees all of the wages that were due by the deadlines imposed by California Labor Code §§ 201 and 202. (Second Consolidated Am. Compl. ¶¶ 121-23, Docket No. 77.)

Under § 201, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201(a). If, however, the employee does not have a written employment contract, the employee's "wages shall become due and payable not later than 72 hours" after termination. *Id.* § 202(a). Section 203 of the California Labor Code states that "[i]f an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty" for up to thirty days. *Id.* § 203(a).

The regulations governing these waiting time penalties state that "a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." Cal. Code Regs. tit. 8, § 13520. The regulations clarify that:

> A "good faith dispute" that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a "good faith dispute."

*Id.* § 13520(a).

The Court agrees with RBC that there was, "[a]t the very least, . . . a good faith dispute [as to] whether [plaintiffs] w[ere] exempt from overtime and whether any improper deductions were made." (Mem. in Supp. of Def.'s Mot. for Summ. J. at 23, Docket No. 152.) "So long as no other evidence suggests the employer acted in bad faith, presentation of a good faith defense, based in law or fact, will negate a finding of

willfulness." *Amaral v. Cintas Corp.*, 78 Cal. Rptr. 3d 572, 609 (Cal. Ct. App. 2008); *see Campbell v. PricewaterhouseCoopers, LLP*, 602 F. Supp. 2d 1163, 1185 (E.D. Cal. 2009). Because RBC has come forward with substantive defenses to the California claims, plaintiffs cannot simply rest on their allegations "that [RBC] willfully violated California state overtime laws." (*See* Pl. Blumberg-Markus' Resp. to Def.'s Mot. for Summ. J. at 35, Docket No. 223.) *Cf. Lopez v. United Parcel Serv., Inc.*, No. 08-5396, 2010 WL 728205, at *9 (N.D. Cal. Mar. 1, 2010). Plaintiffs have failed to come forward with any evidence that RBC acted in bad faith, *cf., e.g.*, *Takacs*, 444 F. Supp. 2d at 1126-27, and therefore RBC's good faith defense bars plaintiffs from recovering waiting time penalties. The Court finds that RBC has raised numerous reasonable, non-frivolous defenses to plaintiffs' claims, and therefore grants RBC summary judgment on Count 7 as to all California plaintiffs. *See Reber v. AIMCO/Bethesda Holdings, Inc.*, No. 07-607, 2008 WL 4384147, at *9 (C.D. Cal. Aug. 25, 2008) ("Although the Court has concluded that a genuine issue of material fact exists as to whether Reber and Dunnington are administrative employees, it is clear that a good faith dispute exists on this point. Accordingly, penalties under Section 203 are unwarranted.").

**Count 8: Bimonthly Pay Period**

Count 8 alleges that RBC failed to pay employees twice during each calendar month, in violation of California Labor Code § 204. (Second Consolidated Am. Compl. ¶¶ 125-26, Docket No. 77.) The California plaintiffs "do[] not oppose [RBC's] motion with respect to [their] claims under California Labor Code § 204[.]" (Pl. Blumberg-

Markus' Resp. to Def.'s Mot. for Summ. J. at 1 n.2, Docket No. 223; Pl. David's Resp. to Def.'s Mot. for Summ. J. at 1 n.2, Docket No. 225; Pl. Kennedy's Resp. to Def.'s Mot. for Summ. J. at 1 n.2, Docket No. 227; Pl. Kuhlman's Resp. to Def.'s Mot. for Summ. J. at 1 n.2, Docket No. 229.) The Court therefore grants RBC's unopposed motion for summary judgment on Count 8.

## Count 9: Rest and Meal Breaks

Count 9 alleges that RBC failed to provide employees with rest and meal breaks as required under California Labor Code § 512 and applicable state regulations. (Second Consolidated Am. Compl. ¶¶ 128-29, Docket No. 77.) Under § 512 of the California Labor Code,

> [a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee.

Cal. Lab. Code § 512(a); *see also* Cal. Code Regs. tit. 8, § 11040(11) (same). The relevant regulations interpreting the California Labor Code further provide that "[e]very employer shall authorize and permit all employees to take rest periods . . . . at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof." Cal. Code Regs. tit. 8, § 11040(12)(A).

The regulations governing rest and meal breaks expressly state that those provisions "shall not apply to persons employed in administrative, executive, or professional capacities." Cal. Code Regs. tit. 8, § 11040(1)(A). Therefore, to the extent

that there is no genuine issue of material fact that David and Kuhlman are exempt, the Court grants RBC's motion for summary judgment on Count 9 for all relevant periods with respect to Kuhlman, and for the period beginning September 1, 2004, with respect to David.

With respect to potentially nonexempt employees, however, California law is unsettled regarding whether an employer must simply make rest and meal breaks available to employees, or whether the employer must actively ensure that employees take those breaks.  As the California Court of Appeal observed earlier this year:

> [Defendant] relies principally on federal district court decisions, notably, *Brown v. Federal Express Corp.* (C.D. Cal. 2008) 249 F.R.D. 580, and *White v. Starbucks Corp.* (N.D. Cal. 2007) 497 F. Supp. 2d 1080, 1089 (N.D. Cal. 2007), which found that employers need only "provide" meal breaks and need not ensure the employee actually takes the meal break. The law on this issue is unsettled.  In *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal. App. 4th 949 (*Cicairos*), in contrast with *Brown* and *White*, the court of appeal held that an employer's obligation to provide employees with an adequate meal period was not satisfied "by assuming that the meal periods were taken, because employers have 'an affirmative obligation to ensure that workers are actually relieved of all duty.'"  (*Id.* at [] 962.)  We note that the California Supreme Court has granted review in two cases that conflict with *Cicairos*.  (*See Brinker Restaurant Corp. v. Superior Court* (2008) 165 Cal. App. 4th 25, 31 [holding that employers "need only provide [meal breaks] and not ensure they are taken."], *review granted* October 22, 2008, S166350, and *Brinkley v. Public Storage, Inc.* (2008) 167 Cal. App. 4th 1278, 1290 [holding that "California law does not require an employer to ensure that employees take rest periods.  An employer need only make rest periods available."], *review granted* January 14, 2009, S168806.)

*Jaimez v. DAIOHS USA, Inc.*, No. B209486, 181 Cal. App. 4th 1286, ___, 2010 WL 93848, at *11 (Cal. Ct. App. Jan. 12, 2010) (parallel citations omitted).

The Court agrees with plaintiffs that "it is impossible to predict the result of the California Supreme Court in [*Brinker* and *Brinkley*]," and therefore, in the interests of comity and judicial economy, the Court will "defer ruling on this issue until the California Supreme Court has issued its opinions in [both] cases." (*See* Blumberg-Markus' Resp. to Def.'s Mot. for Summ. J. at 35, Docket No. 223.) The Court therefore denies without prejudice RBC's motion for summary judgment on Count 9 with respect to Kennedy and, for rest and meal breaks prior to September 1, 2004, with respect to David.[20]

## Count 10: Records

Count 10 alleges that RBC failed to provide employees with accurate and detailed records of hours worked and wages earned, in violation of California Labor Code § 226(a). (Second Consolidated Am. Compl. ¶ 131, Docket No. 77.)

Section 226 of the California Labor Code requires each employer to "furnish each of his or her employees . . . an accurate itemized statement in writing showing (1) gross wages earned, [and] (2) total hours worked by the employee," as well as information about deductions, hourly rates, and other details relating to payment. Cal. Lab. Code § 226(a). Section 226(e) allows an employee "suffering injury as a result of a knowing

---

[20] If the trier of fact concludes that Kennedy falls under the administrative exemption, RBC will be entitled to judgment as a matter of law on Count 9 for the reasons set forth above regarding David and Kuhlman.

Blumberg-Markus's claim under Count 9 appears to be time-barred. *See* Cal. Civ. Proc. Code § 338(a). Because the parties have not briefed this issue, however, the Court denies without prejudice RBC's motion for summary judgment as to her claim under Count 9.

and intentional failure by an employer to comply with" § 226(a) to recover certain monetary damages. It states:

> An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

*Id.* § 226(e). Section 226(g) allows an employee to bring an action for injunctive relief "to ensure compliance with this section." *Id.* § 226(g).

RBC argues that claims for statutory penalties for violations of § 226(a) are limited by the one-year statute of limitations that governs penalties. *See* Cal. Civ. Proc. Code § 340(a). Plaintiffs do not dispute this argument, but instead claim that the complaint also seeks actual damages in the form of lost wages, and that such claims are governed by the three-year statute of limitations in California Civil Procedure Code § 338(a).

The Court concludes that, under California law, claims seeking lost wages for violations of § 226(a) are claims seeking penalties and therefore are governed by the one-year statute of limitations. First, the language of § 226(e) demonstrates that the maximum "aggregate **penalty**" under the statute may consist of "actual damages or" the statutory penalties. Cal. Lab. Code § 226(e) (emphasis added). Second, the California Supreme Court recognized in *Murphy v. Kenneth Cole Productions, Inc.* that the California legislature, in enacting § 226 and several other provisions "was aware that it could, if so desired, trigger a one-year statute of limitations by labeling a remedy a

penalty." 155 P.3d 284, 293 (Cal. 2007). Section 226(e) includes actual damages among the components of an "aggregate penalty." Therefore, actual damages under § 226(e) are a penalty, and claims for actual damages under § 226(e) must be brought within the one-year statute of limitations.

RBC further argues that an employee may only recover penalties if he or she has "suffer[ed] injury as a result of a knowing and intentional failure . . . to comply with subdivision (a)." Cal. Lab. Code § 226(e). In *Elliot v. Spherion Pacific Work, LLC*, the United States District Court for the Central District of California examined several cases involving alleged violations of § 226(a). 572 F. Supp. 2d 1169, 1181 (C.D. Cal. 2008). The court noted that it must give effect to the phrase "suffering injury" in § 226(e), and that other courts construing that provision had "identified some specific injury caused by the [employer's] inaccuracy." *Id.* "These injuries included the possibility of not being paid overtime, employee confusion over whether they received all wages owed them, difficulty and expense involved in reconstructing pay records, and forcing employees to make mathematical computations to analyze whether the wages paid in fact compensated them for all hours worked." *Id.* In *Elliot*, however, the court found that there was no evidence that the plaintiff "suffered injury" as a result of the employer's violation of § 226(a), because the only inaccuracy was the "use of a slightly truncated name on [plaintiff's] wage statements." *Id.*

RBC also attempts to use the "knowing and intentional" phrase to graft the good faith exception for waiting time penalties onto § 226. The good faith exception for waiting time penalties, however, arises from the express language of the regulations

interpreting the waiting time penalty statute. RBC has not identified any similar regulations applicable to § 226 or any case law suggesting that the exception should apply in the context of § 226(a) violations. In the absence of such guidance, the Court declines to adopt such an expansive exception to the California legislature's express statutory language. There is a genuine issue of fact regarding whether RBC knowingly and intentionally failed to comply with § 226(a). RBC's assertion that it had a good faith belief that certain employees qualified for the administrative exemption, and therefore that RBC did not need to comply with § 226(a), is not sufficient to warrant summary judgment.

### Blumberg-Markus

Blumberg-Markus "does not oppose [RBC's] motion with respect to [her] claims under California Labor Code § . . . 226(a)." (Pl. Blumberg-Markus' Resp. to Def.'s Mot. for Summ. J. at 1 n.2, Docket No. 223.)

### David

David filed his complaint on July 27, 2006, more than one year after June 2005, when RBC terminated him. Therefore, his claim under Count 10 is time-barred as a matter of law.

### Kennedy

RBC argues that Kennedy suffered no injury as a result of not receiving a pay stub that showed his actual hours worked, and therefore that he cannot recover penalties under

§ 226(e).  If Kennedy is not exempt, however, he will have suffered injury by not having an accurate record of his actual hours worked, because he will be unable to calculate the overtime and minimum wages that RBC owes him.  *See Elliot*, 572 F. Supp. 2d at 1181. The Court therefore denies RBC's motion for summary judgment on Count 10 as to Kennedy.

Kuhlman

RBC raises the same arguments with respect to Kuhlman as it does with respect to Kennedy.  For the reasons stated in the preceding paragraph, the Court denies RBC's motion for summary judgment on Count 10 as to Kuhlman.

**Count 11: Unfair Competition**

Count 11 alleges that RBC, by failing to pay wages due as required by law, engaged in unfair competition in violation of the California Business and Professions Code § 17200.  (Second Consolidated Am. Compl. ¶¶ 134-40, Docket No. 77.) California's Unfair Competition Law ("UCL") has a four-year statute of limitations.  Cal. Bus. & Prof. Code § 17208.

Blumberg-Markus was last employed at RBC in December 2002, and she filed suit in 2007. [21]   Therefore, her UCL claim is time-barred.  The Court has denied RBC's motion for summary judgment as to some of the FLSA and state law claims brought by

---

[21] Plaintiffs do not argue that Blumberg-Markus's claims relate back to the date when either of the original California plaintiffs filed their complaints in state court, and therefore they have waived this argument.

David, Kennedy, and Kuhlman. Those claims therefore may form a basis for those plaintiffs' derivative UCL claims.

### E. Claims Under New York Law (Counts 12 and 13)

Count 12 alleges that RBC wrongfully denied Capozzoli overtime compensation under New York Labor Law § 142-2.2. (Second Consolidated Am. Compl. ¶¶ 142-47, Docket No. 77.) The parties agree that Capozzoli's New York Labor Law claim is governed by the same substantive standards as her FLSA claim. (Mem. in Supp. of Def.'s Mot. for Summ. J. at 18 n.5, Docket No. 131; Pl. Capozzoli's Resp. to Def.'s Mot. for Summ. J. at 13 n.12, Docket No. 213.) Therefore, because the Court denied RBC's motion for summary judgment as to Capozzoli's FLSA claims, it also denies RBC's motion for summary judgment as to Count 12, because there is a genuine issue of material fact as to whether Capozzoli satisfies the second requirement of the administrative exemption.

There is one potentially relevant distinction between the FLSA and the parallel New York labor laws: New York law has a higher salary basis requirement than the FLSA. *See* N.Y. Lab. Law § 142-2.14(c)(4)(i)(e)(3) (establishing a salary basis of not less than $506.25 per week for the 2006 calendar year, the last year of Capozzoli's employment with RBC). Pamela Iverson, an RBC Compensation Solutions Manager, provided a declaration stating that "in every month of Capozzoli's employment with RBC in 2006 . . . , her pay exceeded $2,193.75" per month, or $506.25 per week. (Iverson Decl. ¶¶ 12, 14, Docket No. 167.) Capozzoli asserts, without citation to the record, that

her "effective base salary fell to $26,000 ($500 per week) in June 2006, and to $23,000 (approximately $442 per week) in August 2006." (Pl. Capozzoli's Resp. to Def.'s Mot. for Summ. J. at 12, Docket No. 213; *see also id.* at 27.) Because Capozzoli has failed to identify any record evidence in support of her assertion, and because RBC has offered evidence showing that Capozzoli's compensation satisfied New York's higher salary basis requirement, the Court finds that there is no genuine issue of material fact that Capozzoli satisfied the state salary basis requirement at all relevant times.

Count 13 alleges that RBC made unauthorized deductions from Capozzoli's wages, as prohibited under New York Labor Law § 193. (Second Consolidated Am. Compl. ¶¶ 149-57, Docket No. 77.) The complaint alleges that RBC violated § 193 by "charg[ing] back both the commissions on, and a portion of the actual value of the losses resulting from, reversed or broken trades that were allegedly caused by [Capozzoli], whether through simple negligence or through no fault of the employee at all." (*Id.* ¶ 153.) In response to RBC's motion for summary judgment, plaintiffs state that they "will not . . . oppose Defendant's motion with respect to [Capozzoli's] claims under § 193 of the New York Labor Law" because "RBC applied negative adjustments to her pay in a manner that appears lawful under the standard recently enunciated by the New York Court of Appeal in *Pachter v. Bernard Hodes Group, Inc.*, [891 N.E.2d 279 (N.Y. 2008)]." (Pl. Capozzoli's Resp. to Def.'s Mot. for Summ. J. at 1 n.2, Docket No. 213.) The Court therefore grants RBC's unopposed motion for summary judgment on Count 13.

## F. Minimum Wage Claim Under Florida Law (Count 14)

On behalf of the Florida plaintiffs, the complaint alleges that RBC "failed to properly pay a minimum wage for all hours worked to" RBC's securities brokers who were employed in Florida. (Second Consolidated Am. Compl. ¶ 160, Docket No. 77.) The complaint alleges that "under Article X, § 24 of the Florida Constitution and § 448.10 of the Florida Statutes," the Florida plaintiffs are entitled "to be paid at a rate of pay for each hour worked that is no less than the minimum wage for all hours worked." (*Id.* ¶ 159.) Plaintiffs contend that Florida law does not allow the FLSA "averaging method," but instead requires that an employer pay minimum wage for all hours worked. (*See* Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 3, Docket No. 217.)

On November 2, 2004, Florida voters amended the Florida Constitution to add a minimum wage provision. Fla. Const. art. X, § 24. The amendment's implementing legislation, the Florida Minimum Wage Act ("FMWA"), took effect on May 2, 2005. Fla. Stat. § 448.110(2). The FMWA is "the exclusive remedy under state law for violations" of Section 24. *Id.* § 448.110(10). It allows "[a]ny person aggrieved by a violation of [the FMWA to] bring a civil action . . . against an employer violating" the FMWA. *Id.* § 448.110(6)(a).

The FMWA imposes a pre-suit notice requirement:

[P]rior to bringing any claim for unpaid minimum wages pursuant to this section, the person aggrieved shall notify the employer alleged to have violated this section, in writing, of an intent to initiate such an action. The notice must identify [(1)] the minimum wage to which the person aggrieved claims entitlement, [(2)] the actual or estimated work dates and hours for which payment is sought, and [(3)] the total amount of alleged unpaid wages through the date of the notice.

*Id.* After receiving this pre-suit notice, "[t]he employer shall have 15 days . . . to pay the total amount of unpaid wages or otherwise resolve the claim to the satisfaction of the person aggrieved." *Id.* § 448.110(6)(b). "If the employer fails to pay the total amount of unpaid wages or otherwise resolve the claim to the satisfaction of the person aggrieved, then the person aggrieved may bring a claim for unpaid minimum wages, the terms of which must be consistent with the contents of the notice." *Id.*

On January 28, 2008, the Florida plaintiffs informed RBC by letter of their intent to bring a claim under the FMWA. (Eng Letter, Jan. 28, 2008, Wells Decl. Ex. 52, Docket No. 231.) It states:

> Pursuant to Section 448.110(6)(a) and (b), Florida Statutes, Felipe Pazos, Alberto Roque, Patrick Grattan, Andres Cruz, and Carlos Alvarez (collectively "Claimants"), hereby provide notice that they intend to initiate an action for unpaid minimum wages for all hours worked on behalf of themselves and a class of similarly situated persons who were employed by RBC Dain Rauscher, Inc. (the "Company") in the State of Florida and held positions as Financial Advisors, Junior Financial Advisors, Assistant Level Financial Advisors and/or Financial Advisors Trainees during the four years prior to the date of this notice. Claimants were employed at the Miami office of the Company. The amount of unpaid wages and individual class members are otherwise identifiable from the records in the custody of the Company.

(*Id.*) On February 1, 2008, RBC responded to the letter, stating in part:

> [Y]our notice under Section 448.110(6)(a) is deficient as you have failed to identify "the minimum wage to which the person aggrieved claims entitlement, the actual or estimated work dates and hours for which payment is sought, and the total amount of alleged unpaid wages through the date of the notice." I trust you will cure your deficiency.

(Schnell Letter, Feb. 1, 2008, Wells Decl. Ex. 61, Docket No. 231.) In response, the Florida plaintiffs wrote:

[T]he Company argues that Claimants' letter dated January 28, 2008, was "deficient" because it did not detail certain information with respect to the claims for unpaid minimum wages. Claimants state, as previously noted in their prior letter, that the Company is in possession of the employment records necessary to calculate such unpaid minimum wage for Claimants and all class members. Please advise us whether the Company will provide such documents.

(Eng Letter, Feb. 6, 2008, Wells Decl. Ex. 73, Docket No. 231.)

The Court finds that the Florida plaintiffs failed to comply with the pre-suit notice requirement in § 448.110(6)(a), and therefore grants RBC's motion for summary judgment on Count 14. Plaintiffs offer two arguments to excuse their failure to comply with the FMWA. First, they argue that compliance was "impossible" because RBC controlled the information that plaintiffs needed to comply, and because RBC refused to provide the necessary records. (Pl. Grattan's Resp. to Def.'s Mot. for Summ. J. at 3, 32-33, Docket No. 217.) Second, they argue that RBC "could have just as easily determined [the information required in the pre-suit notice] based upon its own records in its possession," and therefore the Court should not dismiss the claim based on this "technicality." (*Id.* at 3, 33.) The Court addresses these arguments in turn.

First, plaintiffs were capable of providing at least some of the information required in the pre-suit notice. Florida law requires that the pre-suit notice identify three things: (1) "the minimum wage to which the person aggrieved claims entitlement," (2) "actual **or estimated** work dates and hours" for which the person allegedly was not paid the minimum wage, and (3) "the total amount of alleged unpaid wages." Fla. Stat. § 448.110(6)(a) (emphasis added). Plaintiffs were fully capable of determining, even without RBC's cooperation, the applicable minimum wage under Florida law. Plaintiffs

were also capable of providing "estimated" work dates and hours. Based on the statutory minimum wage and those estimates, plaintiffs were capable of stating "the total amount of alleged unpaid wages." Nothing in the statute excuses non-compliance where an employer refuses to provide necessary records. Indeed, the fact that the statute allows an employee to state "estimated work dates and hours" recognizes that the employee may not have complete access to employer records.

Plaintiffs' second argument would eviscerate the statutory pre-suit notice requirement that the Florida legislature established. **Every** employer possesses some records about its employees and the days and hours they have worked. If the Court were to overlook plaintiffs' failure to comply with this purported "technicality," then no employee would need to provide the information specified in the statute. In *Curry v. High Springs Family Practice Clinic & Diagnosis Center Inc.*, No. 08-00008, 2008 WL 5157683, at *9 (N.D. Fla. Dec. 9, 2008), the United States District Court for the Northern District of Florida examined an employee's resignation letter and concluded that it did not comply with § 448.110(a)(6). The court explained:

> Proper notice would include the minimum wage sought, an estimate of the hours and dates worked, and an estimate of the wages alleged to be due. Fla. Stat. § 448.110(6). Although the Plaintiff's letter includes a general estimate of the dates that the Plaintiff alleges to have worked, it does not purport to notify the Defendants of the Plaintiff's intent to file suit, nor does it provide an estimate of the hours worked or the wages due. Further, the letter makes no demand for wages at all. The letter does not satisfy the pre-suit notice requirement[.]

*Id.* at *10. Plaintiffs do not cite any Florida case that suggests that "substantial compliance" is sufficient under § 448.110(a)(6), and, consistent with *Curry*, the Court

refuses to adopt a reading of Florida law that would render the express language of the pre-suit notice requirement a nullity.[22]

The Court concludes that the Florida plaintiffs' pre-suit letters to RBC do not comply with the statutory requirements for pre-suit notice under Florida law. Therefore, the Florida plaintiffs are not entitled, under Florida law, to bring a cause of action against RBC for violation of the FMWA. The Court therefore grants RBC's motion for summary judgment on Count 14.

## II.    MOTION TO CONDITIONALLY CERTIFY THE COLLECTIVE ACTION

Plaintiffs filed their complaint as a "nationwide collective action," and they seek conditional certification of a collective action on behalf of all "Securities Brokers," defined as "individuals who sold and/or marketed financial products (such as securities, bonds or mutual funds) on behalf of" RBC. (Mem. in Supp. at 1, Docket No. 173.) Plaintiffs define Securities Brokers to include Financial Consultants ("FCs"), Senior Financial Associates ("SFAs"), Institutional Salespeople ("ISs"), and Junior Institutional Salespeople ("JISs"). (Mot. to Conditionally Certify Collective Action, Ex. 1 at 2,

_____

[22] Plaintiffs do not argue that the pre-suit notice requirement violates the Florida Constitution, or that the requirement should not apply in federal court. *Cf. Curry*, 2008 WL 5157683, at *9; *Throw v. Republic Enter. Sys., Inc.*, No. 06-724, 2006 WL 1823783, at *2 (M.D. Fla. June 30, 2006). No court construing the requirement has adopted or endorsed plaintiffs' argument that courts may overlook a plaintiff's failure to comply with this statutory "technicality." *See, e.g.*, *Ramirez v. Martinez*, No. 08-21863, 2009 WL 199786, at *5 (S.D. Fla. Jan. 23, 2009) ("[T]he right to recover unpaid minimum wages is properly conditioned up on the aggrieved employee's compliance with the 15-day notice requirement of Fla. Stat. § 448.110(6)."); *Resnick v. Oppenheimer & Co.*, No. 07-80609, 2008 WL 113665, at *3 (S.D. Fla. Jan. 8, 2008) ("[Fla. Stat.] § 448.110(6) is binding and enforceable on Plaintiff.").

Docket No. 170.)  They seek to certify two FLSA sub-classes: one consisting of FCs and SFAs, who are the Securities Brokers in the Private Client Group, and the other consisting of ISs and JISs on the Fixed Income Capital Markets Team.  (Mem. in Supp. at 2, Docket No. 173.)  As of July 31, 2009, the Private Client Group had approximately 2166 FCs and 159 SFAs.  (Iverson Supp. Decl. ¶ 5, Docket No. 242.)  In the Fixed Income Capital Markets Team, RBC employs approximately 127 ISs and 3 JISs.  (*Id.* ¶ 6.)

### A.    Standard for Certification of a Collective Action

Section 216(b) of Title 29 governs certification of collective actions under the FLSA.  29 U.S.C. § 216(b).  It allows "any one or more employees" to maintain an action against their employer "for and in behalf of himself or themselves and other employees **similarly situated**."  *Id.* (emphasis added).

"The fundamental inquiry in determining whether a collective action under § 216(b) is appropriate is whether . . . the plaintiffs are 'similarly situated.'"  *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005). "Unfortunately, [Section] 216(b) does not define the term 'similarly situated,' and there is little circuit law on the subject."  *West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527, at *2 (D. Minn. July 10, 2006) (some internal quotation marks omitted; alteration in original).  "The determination of 'similarly situated' is achieved by analyzing various factors on a case by case basis."  *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *3 (D. Minn. Mar. 18, 1996).  "Plaintiffs bear

the burden of establishing that they are similarly situated." *Smith*, 404 F. Supp. 2d at 1149.

Courts "have developed a two-step process for determining whether plaintiffs are similarly situated for certification of a collective action under the FLSA." *Kalish v. High Tech Inst., Inc.*, No. 04-1440, 2005 WL 1073645, at *1 (D. Minn. Apr. 22, 2005).

"At the initial stage, courts determine whether the class should be conditionally certified for notification and discovery purposes. Such conditional certification requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* (internal quotation marks and emphasis omitted). Conditional certification is appropriate at this stage "when the plaintiffs have established a colorable basis for their claim that a class of similarly situated plaintiffs exist." *Id.* at *2 (internal quotation marks omitted). "A colorable basis means that [the] plaintiff must come forward with something more than the mere averments in its complaint in support of its claim." *Id.* (internal quotation marks omitted; alteration in original). Plaintiffs must also show "that factual similarities or differences among the putative Plaintiffs are such that the case may be properly managed as a collective action." *West*, 2006 WL 1892527, at *3. "However, plaintiffs' burden is not so rigorous that they must demonstrate their positions are identical to those of the opt-in plaintiffs. Rather, plaintiffs need show only that their positions are similar." *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007) (citations and internal quotation marks omitted). "In determining whether Plaintiffs have met the burden, the Court does not make any credibility determinations or findings of fact with respect to

contrary evidence presented by the parties at this initial stage." *Ahle v. Veracity Research Co.*, No. 09-00042, 2009 WL 3103852, at *3 (D. Minn. Sep. 23, 2009) (internal quotation marks omitted). "[H]owever, some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency." *West*, 2006 WL 1892527, at *3 (internal quotation marks omitted).

"The second step comes after discovery is completed, usually upon a motion to decertify the class. At this later stage, the court uses a stricter standard for determining whether the plaintiffs are similarly situated and reconsiders whether the trial should proceed collectively or if it should be severed." *Kalish*, 2006 WL 1073645, at *1 (citation omitted). Courts have recognized that "permitting plaintiffs to issue class notice does not equal class certification. Authorizing class notice merely allows the plaintiffs to proceed as a class throughout discovery. The court can 'decertify' the class following discovery when the court has more information to achieve a factual determination on the similarly situated question." *Ray*, 1996 WL 938231, at *2. "At the second stage, the court conducts a fact intensive inquiry of several factors, including: (1) the extent and consequence of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *West*, 2006 WL 1892527, at *3.

Under certain circumstances, courts impose the more stringent standard at the initial stage. *See Kalish*, 2005 WL 1073645, at *2. In those cases, there has already been "'extensive' discovery" or a significant number of potential plaintiffs have already filed

consent forms to join the lawsuit. *Id.*; *see, e.g.*, *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002) (engaging in more rigorous review in light of plaintiff's "extensive discovery with respect to [defendant's] policies regarding the pay provisions of employees"); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497-98 (D.N.J. 2000) (electing "to apply a stricter standard in its analysis," because "over 100 potential plaintiffs ha[d] already opted into this lawsuit" and because discovery had been completed before the motion for certification of collective action had been filed); *Ray*, 1996 WL 938231, at *4 ("[I]n the present case, the facts before the Court are extensive, [and] accordingly there is no need for discovery in order to reach a determination.").

The Court finds that the circumstances of this case do not warrant imposition of the more stringent standard at this stage. Although the parties have conducted some discovery, the discovery process is not yet complete. (Trankiem Decl. ¶ 2, Docket No. 240; Wells Aff. ¶ 2, Docket No. 270.) *West*, 2006 WL 1892527, at *3; *see also Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 894-95 (N.D. Iowa 2008) ("The court is persuaded by the sentiments of other district courts that 'beginning with tier one of the analysis is the most equitable means of proceeding. . . . [S]hould the court bypass tier one entirely, some potential plaintiffs might not become aware of the lawsuit and would not have an opportunity to join the suit. . . . The potential prejudice to plaintiffs of bypassing tier one thus is significant.'"). The Court nonetheless must "review all the evidence before it to determine whether it should facilitate notice and thereby expand the scope of litigation" and must not "abandon its duty to determine whether the matter before it is an appropriate case for collective treatment." *Saleen v. Waste Mgmt., Inc.*,

No. 08-4959, 2009 WL 1664451, at *8 (D. Minn. June 15, 2009); *see West*, 2006 WL 1892527, at *7 ("[N]either the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper.").

### B. Plaintiffs Have Satisfied the Standard for Conditional Certification

Plaintiffs have established a colorable basis for their claim that a Private Client Group Subclass of potential plaintiffs similarly situated to Capozzoli and Kennedy exists. Capozzoli's and Kennedy's FLSA claims have survived summary judgment, and they worked in the Private Client Group – Capozzoli as an SFA and Kennedy as an FC. For purposes of conditional certification of the collective action, the Court finds that SFAs and FCs are similarly situated because they have similar duties and responsibilities and because they have a similar system of compensation. (*See* Mem. in Supp. at 7-9, Docket No. 173; Wells Aff. Ex. D at RBC6462, Docket No. 174.) Although job descriptions and titles are not directly relevant to the Court's ultimate assessment of whether a particular employee is exempt, they do provide an evidentiary basis to establish similarity at this stage. For example, the FINRA guidelines and seven critical functions tested on the Series 7 examination are relevant to the Court's assessment of whether an individual plaintiff is exempt. Uniform employment policies and practices are similarly relevant. Plaintiffs have made substantial allegations that members of the Private Client Group Subclass were together misclassified as exempt employees and that they had similar work duties and responsibilities.

Plaintiffs have established a colorable basis for their claim that a Fixed Income Capital Markets Team Subclass of potential plaintiffs similarly situated to Alvarez and Cruz exists. Alvarez's and Cruz's FLSA claims have survived summary judgment, and they worked on the Fixed Income Capital Markets Team. Alvarez was an IS, and Cruz was a JIS. For purposes of conditional certification of the collective action, the Court finds that ISs and JISs in the Fixed Income Capital Markets Team are similarly situated because they have similar duties and responsibilities and because they have a similar system of compensation. (*See* Powis Dep. at 42, Wells Decl. Ex. 21, Docket No. 231; Mem. in Supp. at 11-13, Docket No. 173.) As discussed in the previous paragraph, job descriptions, titles, RBC's employment policies and practices, the FINRA guidelines, and the seven critical functions are relevant to the Court's assessment of whether an individual plaintiff is exempt. Plaintiffs have made substantial allegations that members of the Fixed Income Capital Markets Team Subclass were together misclassified as exempt employees and that they had similar work duties and responsibilities.

The Court further finds that, at this stage, the factual similarities among the putative plaintiffs are such that the case may be properly managed as a collective action. The Court's analysis on RBC's motions for summary judgment demonstrates that any determination of whether a particular employee is exempt will require a fact-intensive examination of the particular employee's work duties. Nonetheless, the case may be properly managed as a collective action because the putative plaintiffs shared similar work duties and because they operated under similar work conditions. Plaintiffs have

shown that "some identifiable facts or legal nexus . . . bind[s] the claims so that hearing the cases together promotes judicial efficiency." *West*, 2006 WL 1892527, at *3.

The Court also finds that plaintiffs have shown that the action is an appropriate case for collective-action treatment, even though they have not proffered any evidence that any similarly situated individuals wish to opt in to the litigation. RBC argues that "[i]n the absence of such evidence, there would be no basis upon which the Court could conclude that the action was an 'appropriate case' for collective-action treatment." *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1165 (D. Minn. 2007). Ten former RBC employees have joined this suit, and although the Court is granting RBC's motions for summary judgment on the FLSA claims of six of those ten, the Court finds that the existence of ten named plaintiffs is sufficient to warrant collective-action treatment even without a showing that other individuals wish to opt in. *Cf. id.* at 1165 n.4 ("[T]his analysis applies only when there are one or two named plaintiffs. If, for example, eight employees together were to commence an FLSA action, it might be unnecessary to show that others desire to opt in to the litigation, since the sheer number of plaintiffs, standing alone, could render the case 'appropriate' for collective action status.").

## C.    Notice Is Appropriate

The Court finds that notice through a third-party administrator is appropriate, and orders the parties to meet and confer on the form of notice. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169, 171 (1989). "Court authorization of notice serves the

legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Id.* at 172. Plaintiffs do not object to RBC's suggestion that "contact with other Securities Brokers should be supervised by the Court pursuant to Section 216(b) and done using a third-party administrator." (*See* Mem. in Opp'n at 42, Docket No. 239.) The Court therefore denies plaintiffs' request that the Court direct RBC to provide a list of securities brokers to plaintiffs, (Mot. to Conditionally Certify Collective Action at 1, Docket No. 171), and orders the parties to meet and confer regarding the selection of a suitable third-party administrator and regarding an appropriate notice form.

The Court finds that the notice period should extend back three years. As discussed in Part I.B.2, a cause of action for an individual who is a member of an FLSA collective action commences on the date the individual files a written consent with the Court, and the maximum applicable statute of limitations is three years. Notice should be consistent with this determination. The Court finds that that the facts surrounding the parties' joint stipulation to stay litigation do not warrant equitable tolling. *See Delgado v. United States*, No. 97-1(4), 2002 WL 1763997, at *2 & n.3 (D. Minn. July 26, 2002) (noting that "[e]quitable tolling is proper only when extraordinary circumstances beyond a [party's] control make it impossible to file . . . on time, despite [the party's] due diligence," or when the defendant has engaged in conduct that has "lulled the plaintiff into inaction" (internal quotation marks omitted)); *cf. Adams v. Tyson Foods, Inc.*, No. 07-CV-4019, 2007 WL 1539325, at *1-2 (W.D. Ark. May 25, 2007) (granting defendant's motion for stay pending resolution of defendant's motion before the Judicial

Panel on Multidistrict Litigation, over plaintiffs' objection, and ordering that the statute of limitations be tolled from the filing date of defendant's motion to stay).

## III.    MOTION TO CERTIFY THE CLASS

### A.    Standard of Review

"In order to obtain class certification, a plaintiff has the burden of showing that the class should be certified and that the requirements of Rule 23 are met." *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). "In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001). For example, "if some of the considerations under Rule 23[] . . . overlap the merits[,] . . . then the judge must make a preliminary inquiry into the merits." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). In considering the Rule 23 requirements, the Court considers that class actions are "a necessary vehicle for the vindication of small claims," and that "[w]hen there is a question as to whether certification is appropriate, the Court should give the benefit of the doubt to approving the class." *In re Workers' Comp.*, 130 F.R.D. 99, 103 (D. Minn. 1990) (citations omitted).

"Federal Rule of Civil Procedure 23 establishes a two-step analysis to determine whether class certification is appropriate. First, plaintiffs must satisfy the four prerequisites of Federal Rule Civil Procedure 23(a). Second, the action must satisfy at least one of three subdivisions of Federal Rule Civil Procedure 23(b)." *In re Retek Inc. Sec. Litig.*, 236 F.R.D. 431, 434 (D. Minn. 2006).

Rule 23(a) allows a member of a class to sue as a representative party if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

The second consolidated amended complaint sets forth several classes in addition to the nationwide collective action class: a California subclass,[23] a New York subclass,[24] a Florida subclass,[25] and an ERISA subclass.[26] (Second Consolidated Am. Compl. ¶¶ 8-

---

[23] "All current and former Securities Brokers within the State of California, who are or were employed by Defendant at any time from July 27, 2002 to the present, to recover unpaid overtime compensation and other wages due pursuant to the California Labor Code §§ 203, 204, 221, 226(a), 226.7, 400-410, 510, 512, 1194, 2802; Industrial Welfare Commission Orders 4-1998, 4-2000 and 4-2001 (Title 8, California Code of Regulations §§ 11000, 11040); IWC Wage Order 4, section 12, and the California Business and Professions Code §17200 et seq." (Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 at 1, Docket No. 201.)

[24] "All current and former Securities Brokers within the State of New York, who are or were employed by Defendant at any time from December 12, 2001 to the present, to recover unpaid overtime compensation and other wages due pursuant to the New York Labor Codes, Rules and Regulations § 142-2.2." (Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 at 1, Docket No. 201.)

[25] "All current and former Securities Brokers within the State of Florida, who are or were employed by Defendant at any time from January 28, 2003 to the present, to recover unpaid

(Footnote continued on next page.)

13, Docket No. 77.)  Plaintiffs seek certification of the state wage and hour subclasses under Rule 23(b)(3), and seek certification of the ERISA subclass under Rule 23(b)(2).

### B.    The Rule 23(b)(3) State Wage and Hour Subclasses

Rule 23(b)(3) states that "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.    New York and Florida Subclasses

The one remaining state law claim for these proposed subclasses is Capozzoli's claim in Count 12 for violations of New York's FLSA.  For the reasons discussed in Part III.B.2 below with respect to exemptions under California's overtime and minimum wage laws, the Court finds that a New York subclass under Count 12 would not satisfy the predominance requirement in Rule 23(b)(3).  In short, certification is not warranted because individual issues relating to eligibility for the administrative, professional, and

_____
(Footnote continued.)

minimum wages due pursuant to Article X, § 24 of the Florida Constitution and § 448.10 of the Florida Statutes."  (Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 at 1, Docket No. 201.)

[26] "All employees of Defendants from October 19, 2000 to the present with 1,000 hours or more of service credit who were included and/or should have been included in the Wealth Accumulation Plan (WAP), a deferred compensation plan that failed to operate in accordance with Employee Retirement Income Security Act of 1974 ('ERISA')."  (Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 at 1-2, Docket No. 201.)

highly compensated employee exemptions will predominate over any questions of law or fact that are common to the class members.  *See* Fed. R. Civ. P. 23(b)(3).

The Court has granted RBC's motion for summary judgment with respect to all of the remaining claims arising under New York and Florida law.  Because none of the proposed representatives for these subclasses has a remaining viable claim under New York or Florida law, they cannot represent a class purporting to raise such claims.  First, the Court finds that the failed claims of the representative parties are not typical of the putative classes.  *See* Fed. R. Civ. P. 23(a)(3).  Second, the Court finds that, because the Court has granted summary judgment in RBC's favor with respect to these proposed representatives' claims, the proposed representatives have no incentive to fairly and adequately represent the interests of members of the putative class who might have viable claims.  *See id.* R. 23(a)(4).  Because the New York and Florida subclasses fail to satisfy the four prerequisites in Rule 23(a), the Court denies plaintiffs' motion to certify those subclasses.

### 2.    California Subclass

Plaintiffs seek certification of a California subclass that would maintain nine causes of action (Counts 3 through 11) under California law.  First, the Court finds that the proposed California subclass satisfies the numerosity requirement.  RBC concedes that it employed 178 securities brokers in California as of December 31, 2008.  (*See* Def.'s Mem. in Opp'n to Pls.' Mot. for Class Certification at 20, Docket No. 265.)  Second, the Court finds that there are several questions of law and fact common to the

class.  For example, all members of the putative class had similar commission-based compensation structures and faced the risk of chargebacks if they made an error in executing a trade.  All members of the putative class worked for the same employer in the same state under the same set of California wage and hour laws.  Third, the claims of the four representative parties are, collectively, representative of the claims of the putative class.  The following table depicts each cause of action and whether an individual plaintiff has a remaining viable claim for each one:

| Plaintiff | Count 3 | Count 4 | Count 5 | Count 6 | Count 7 | Count 8 | Count 9 | Count 10 | Count 11 |
|-----------|---------|---------|---------|---------|---------|---------|---------|----------|----------|
| Blumberg-Markus | No | No | Yes | Yes | No | No | Yes | No | No |
| David | Yes | Yes | Yes | Yes | No | No | Yes/No | No | Yes |
| Kennedy | Yes | Yes | Yes | No | No | No | Yes | Yes | Yes |
| Kuhlman | No | No | Yes | No | No | No | No | Yes | Yes |

With the exceptions of Counts 7 and 8, which are no longer viable, for each of the Counts there is at least one California plaintiff whose claims have survived summary judgment. In most cases, the claims of the remaining representative parties are typical of the claims of the class.  Kennedy's claims under the California overtime and minimum wage statutes, for instance, raise the critical issue of whether Kennedy and others engaging in similar work duties qualify for the administrative exemption.  With regard to Count 5, all plaintiffs were compensated based at least in part on commissions, and faced the prospect that RBC would deduct from future commissions any loss that RBC incurred due to a broker's negligent execution of a trade.  The Court finds that the putative class satisfies the typicality requirement.

The Court has some concern, however, that the representative parties will not fairly and adequately protect the interests of the class, because no single plaintiff has viable claims under all seven remaining counts. Individual plaintiffs will have an incentive to advocate on behalf of the claims that are viable as to them, and their interests may be at odds with those of other plaintiffs who have different viable claims.

Assuming, for the sake of argument, that the putative California subclass satisfies all four of the Rule 23(a) prerequisites, the Court nonetheless finds that certification is not warranted because individual issues with respect to the seven causes of action will predominate over any questions of law or fact that are common to the class members. *See* Fed. R. Civ. P. 23(b)(3). As demonstrated in the Court's foregoing analysis about the administrative and highly compensated employee exemptions, the trier of fact must engage in a painstaking and fact-intensive inquiry with respect to each individual plaintiff's actual, day-to-day work duties in order to determine whether the plaintiff qualifies for the exemption. Similarly, to determine whether RBC took an unlawful offset in violation of § 221 of the California Labor Code, the Court must examine each individual's pay records to determine whether RBC took any deductions, then the Court must determine whether each particular deduction was simply cancellation of an unearned commission or deduction of an incurred loss, and then the Court must determine, with respect to each error, whether the plaintiff acted inadvertently, with simple negligence, with gross negligence, or willfully. To determine whether RBC violated § 2802 of the California Labor Code for failure to reimburse employees for necessary expenses, the Court must examine each employee's alleged expenses and must

determine whether they were "reasonable." These and other claims under California law present the type of fact-intensive inquiries that, viewed in combination, are not suitable for class treatment. The Court therefore denies plaintiffs' motion to certify a California subclass.

### C. The Rule 23(b)(2) ERISA Subclass

Because Kennedy lacks constitutional standing to bring an ERISA challenge to the WAP, his claims are not typical of the claims of the putative ERISA subclass, and he has no incentive to protect the interests of the subclass. *See* Fed. R. Civ. P. 23(a)(3)-(4). The Court therefore denies plaintiffs' motion to certify an ERISA subclass.

### ORDER

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

**1.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Grattan's Claims [Docket No. 114] is **GRANTED** as to Counts 1, 2, and 14 of the Second Consolidated Amended Complaint.

**2.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Roque's Claims [Docket No. 119] is **GRANTED** as to Counts 1, 2, and 14 of the Second Consolidated Amended Complaint.

**3.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Pazos' Claims [Docket No. 124] is **GRANTED** as to Counts 1, 2, and 14 of the Second Consolidated Amended Complaint.

**4.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Capozzoli's Claims [Docket No. 129] is **GRANTED in part and DENIED in part**, as follows:

    **a.** As to Counts 1, 2, and 12 of the Second Consolidated Amended Complaint, the motion is **DENIED**; and

    **b.** As to Count 13 of the Second Consolidated Amended Complaint, the motion is **GRANTED**.

**5.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Cruz's Claims [Docket No. 133] is **GRANTED in part and DENIED in part**, as follows:

    **a.** As to Counts 1 and 2 of the Second Consolidated Amended Complaint, the motion is **DENIED**; and

    **b.** As to Count 14 of the Second Consolidated Amended Complaint, the motion is **GRANTED**.

**6.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Alvarez's Claims [Docket No. 139] is **GRANTED in part and DENIED in part**, as follows:

**a.** As to Counts 1 and 2 of the Second Consolidated Amended Complaint, the motion is **DENIED**; and

**b.** As to Count 14 of the Second Consolidated Amended Complaint, the motion is **GRANTED**.

**7.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Blumberg-Markus' Claims [Docket No. 150] is **GRANTED in part and DENIED in part**, as follows:

**a.** As to Counts 5 and 6 of the Second Consolidated Amended Complaint, the motion is **DENIED**;

**b.** As to Count 9 of the Second Consolidated Amended Complaint, the motion is **DENIED without prejudice**; and

**c.** As to Count 1, 2, 3, 4, 7, 8, 10, and 11 of the Second Consolidated Amended Complaint, the motion is **GRANTED**.

**8.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff David's Claims [Docket No. 155] is **GRANTED in part and DENIED in part**, as follows:

**a.** As to Counts 1, 2, 3, and 4 of the Second Consolidated Amended Complaint, the motion for summary judgment is **DENIED without prejudice**;

**b.** As to Counts 5, 6, and 11 of the Second Consolidated Amended Complaint, the motion is **DENIED**;

**c.** As to Counts 7, 8, and 10 of the Second Consolidated Amended Complaint, the motion is **GRANTED**; and

**d.** As to Count 9 of the Second Consolidated Amended Complaint, the motion is **GRANTED in part and DENIED without prejudice in part**.

**9.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Kulman's [sic] Claims [Docket No. 160] is **GRANTED in part and DENIED in part**, as follows:

**a.** As to Counts 5, 10, and 11 of the Second Consolidated Amended Complaint, the motion is **DENIED**; and

**b.** As to Count 1, 2, 3, 4, 6, 7, 8, and 9 of the Second Consolidated Amended Complaint, the motion is **GRANTED**.

**10.** Defendant RBC Capital Markets Corporation's Motion for Summary Judgment as to Plaintiff Kennedy's Claims [Docket No. 183] is **GRANTED in part and DENIED in part**, as follows:

**a.** As to Counts 1, 2, 3, 4, 5, 10, and 11 of the Second Consolidated Amended Complaint, the motion is **DENIED**;

**b.** As to Count 9 of the Second Consolidated Amended Complaint, the motion is **DENIED without prejudice**; and

**c.** As to Counts 6, 7, 8, and 15 of the Second Consolidated Amended Complaint, the motion is **GRANTED**.

**11.** Plaintiffs' Motion to Conditionally Certify Collective Action and Facilitate Notice to Potential Plaintiffs [Docket No. 171] is **GRANTED in part and DENIED in part**, as follows:

**a.** The Court **CONDITIONALLY CERTIFIES** this consolidated action as a collective action under 29 U.S.C. § 216(b) of the Fair Labor Standards Act;

**b.** The Court **ORDERS** the parties to provide notice through a third-party administrator of the collective action to all similarly situated persons currently or formerly employed by RBC Capital Markets Corporation or its predecessors;

**c.** The Court **ORDERS** the parties to meet and confer regarding the selection of a suitable third-party administrator and regarding the form of notice and consent to become a party plaintiff;

**d.** The Court **ORDERS** defendant RBC Capital Markets Corporation to provide the selected third-party administrator with an electronic list identifying similarly situated persons and their contact information; and

**e.** In all other respects, the Court **DENIES** the motion.

**12.** Plaintiffs' Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23 [Docket No. 201] is **DENIED**.

DATED:  March 31, 2010
at Minneapolis, Minnesota.

                     s/ John R. Tunheim
                        JOHN R. TUNHEIM
                    United States District Judge